CASE 89.—PROSECUTION AGAINST THOMAS COYLE FOR MURDER.—May 8.

## Coyle v. Commonwealth

Appeal from Madison Circuit Court.

J. M. BENTON, Circuit Judge.

Defendant convicted and appeals. Reversed.

1. Homicide—Dying Declarations—Determination as to Competency—On a trial for murder the question of the competency of evidence of a dying declaration is for the court.
2. Same—Appeal—Harmless Error—Instructions—In a prosecution for murder, an instruction submitting to the jury the question of the competency of dying declarations, though improper, is not alone cause for reversal.
3. Same—Dying Declarations—Admissibility—Hope of Recovery—In a prosecution for murder, there was evidence that deceased was shot in the arm between the elbow and shoulder. On the day following the shooting, the arm was amputated, and on the ensuing day, about 3 in the morning, deceased died.

Coyle v. Commonwealth.

Before a physician had arrived, deceased said that he thought he was going to die because he was shot so near the joint, but there was evidence that he also told his wife that she had a one-armed man now, but that he would make a living for her in some way, and that he spoke to his sister-in-law about removing into another State as soon as he was able. It was also shown that he said that he did not want his assailant to be prosecuted, but would settle with him when he got well. Held, that a statement made by deceased before the physician arrived to amputate his arm was not admissible as a dying declaration.

4. Same—Practice—In a prosecution for murder in which it is sought to introduce a dying declaration, the court should, in the absence of the jury, hear evidence as to the circumstances under which the declaration was made to determine what statements, if any, were made in extremis, and permit these only to be introduced, also allowing defendant to introduce any statements made afterwards for the purpose of lessening or destroying the force of the dying declarations

G. M. SMITH and W. B. SMITH for appellant.

1. We think the question of the admissibility of dying declarations very elementary, as set up in Greenleaf on Evidence, articles 158 and 160. Greenleaf states that the conditions under which the declarations were made, are to be shown to the court, it being his province, and not that of the jury, to determine whether the declarations are admissible.

2. The fourth instruction given by the court in this case should not have been given. This instruction makes the jury the judges of whether the dying decalrations of Riddle, as detailed by his wife, were made under a sense of impending death.

3. We submit that as to the competency and admissibility of evidence the judge alone decides.

### AUTHORITIES CITED.

Matherly v. Commonwealth, 19 S. W., 977; Vaughn v. Commonwealth, 86 Ky., 431; Greenleaf on Evidence, articles 158 and 160; Smith v. State, 110 Ga.: Wyatt v. Commonwealth, 1 S. W., 196; Criminal Code, sec. 271, sub-sec. 6 and 7; Oder v. Commonwealth, 80 Ky., 36; Bohannon v. Commonwealth, 8 Bush, 481; Lusby v. Commonwealth, 12 Bush, 1; Cr. Code, sec. 7, chap. 7; Easts Crown Law, vol. 1, pages 359-360; Massachusetts Report, vol. 165, page 152; Starkie on Evidence, vol. 2, page 459.

Coyle v. Commonwealth.

N. B. HAYS, Attorney General, and CHAS. H. MORRIS for appellee.

It is the contention of the State that under the proof it was proper to sumbit the fact to the jury, whether or not the deceased had given up all hope of recovery when he made the dying declaration, and the instruction given by the court was more favorable to the appellant than he was entitled to. The credibility of the witnesses or the weight to be given the evidence on this point was left with the jury where it belonged, and its admissibility was determined by the court.

### AUTHORITIES CITED.

Moore v. State, 46 Am. Dec., 276; People v. Lawrence, 21 Cal., 368; McPherson v. State, 9 Yerg, 279; State v. Johnson, 74 Am. Dec., 323; Morelack v. State, 90 Tenn., 528; State v. Blackburn, N. C., 478; Commonwealth v. Lawson, 25 Ky. Law Rep., 2187; Greenleaf Ev., 190; Rex v. Scaife, 1 Moo. & R., 551.

OPINION OF THE COURT BY JUDGE NUNN—Reversing.

The appellant appeals from a judgment of conviction, sentencing him to confinement in the penitentiary for 17 years for killing one Hubert Riddle. The appellant and Riddle were brothers-in-law; Riddle having married appellant's sister. It appears from the evidence that Riddle had rented the farm, and half of the house, of Mrs. Coyle, the mother of appellant, for the year 1905. She with her family occupied the other half of the dwelling. The appellant had been absent for several months, and returned to his mothers the day previous to the killing, with a broken or injured rib, and was lying on the bed in his mother's room, on the morning of the difficulty, when Riddle entered with a wagon spoke, drawing it upon the appellant, and commanding him to leave the house at once, and then left with the statement: "If you are not gone when I get back I will kill you."

The deceased then went to Holland's mill with a sack of corn. Holland testified as follows: "I know Thomas Coyle, the defendant, and did know Hubert Riddle. On the day the shooting occurred I was at my mill, known as 'Holland's Mill,' when Hubert Riddle came there with a turn of corn. I had to go to the house for some corn, and he followed me and said: 'Mat, I want to borrow your pistol.' I told him that I had sold it and could not let him have it. He said: 'I am bound to have it, Tom Coyle and I have had a little fuss, and I drew this club (showing a wagon standard he carried in his hand), on him this morning, and told him he had to get out or I would kill him.' At this time they blew for me at the mill, and I had to go, and he stayed at my house until I was gone and got my little brother to give him my pistol. (At this time the pistol that Riddle dropped when he was shot was shown Holland and Holland said it was his.)" When the deceased returned and entered the room he was shot through the fleshy part of the arm about four inches below the shoulder joint. No person was present when the shot was fired. The appellant testified that when Riddle left that morning, he got his father's gun and placed it under the bed, and when Riddle returned, he heard him walking around the house, he arose from the bed, picked up the gun, and started to the stairway, believing that if he went up stairs that Riddle would not follow him, but before he could get to the stairway Riddle opened the back door and entered the room, drawing a pistol, which seemed to hang in his pocket for an instant, and then he fired with the gun at Riddle's arm, with the purpose of saving himself from death; that he did not want to kill him. After the shot was fired

Riddle left the room, and appellant followed and offered to go for any physician he wanted, but Riddle would not say anything. The Commonwealth introduced only three witnesses, who testified as follows:

Mrs. Riddle testified: "I am the widow of Hubert Riddle, the deceased, and also the sister of Thomas Coyle, the defendant. We had been married about eight months. My husband had rented my mother's, Mrs. Coyle's, farm, and also one-half of the house; my mother reserving one room up stairs and one room down stairs. My husband did not like Tom Coyle, and told my mother he did not want Tom lying around there. Tom Coyle, the defendant, had been away from home for some time, and had only returned the day before the shooting. On the morning of the shooting, I, in company with my mother and sister, Spicey, left home for a little place called Nead Moore, and my husband went the other way to Holland's Mill. After my husband had left, Tom Coyle came around the house where my mother, my sister, and I were, and he had my father's gun, and said that Hubert had ordered him away, but that he would take that gun and kill the d—n son of a b——h. In the afternoon my sister Spicey and I were at a neighbors when we heard the shot at home, and when we got there I found my husband shot in the arm about four inches below the shoulder. This occurred in Madison county and on the 18th day of April, 1905. We sent for a doctor immediately, but the doctor did not arrive until the following day, about noon. On the day after the shooting between the hours of 7 and 8 in the morning, my husband told me that he believed he was going to die, and made the following statement: 'My husband told me that he

had been to mill, and as soon as he came home he walked around the house with his meal, and when he came to the meal-room it was locked, and he turned and went to Mrs. Coyle's room, where the key was kept, and he stepped inside the door and Tom Coyle was there with his gun leveled at him and shot him before he could move.' About 12 o'clock on the same day Dr. Gibson arrived and amputated his arm; but did not say anything about him being in a dangerous condition. On the following morning about 3 o'clock my husband died. He never made any statement to me about his condition after the amputation of his arm. He never objected to the amputation, but told me to do what I thought best. He told me that he was going to die, and that he wanted me to join the church and try to live right.'' The court asked the witness whether or not he gave any reason for thinking a gun shot wound in the arm would kill him; the witness said ''that her husband said he believed it would kill him, because the wound was so close to the joint.''

Charlie Riddle, brother of the deceased, testified as follows: ''I am the brother of Hubert Riddle, deceased, and was in the room with my sister-in-law on the morning of March 18, 1905, between the hours of 7 and 8, and heard my brother's dying statement, which was: He said he believed he was going to die; that he had been to mill, and as he came home walked around the house with his meal to the meal-room, and finding it locked, went to Mrs. Coyle's room to get the key, and upon stepping inside Thomas Coyle was there with his gun leveled at him, and fired before he could move. It seemed to me that the doctor was a long time coming, and I got my horse and went to meet the doctor, but took the wrong road

Coyle v. Commonwealth.

and missed him; during my absence the doctor came and amputated my brother's arm. After my brother's arm was amputated, he made no statement as to his condition.''

George Herd, introduced by the Commonwealth, testified as follows: ''I live near where Hubert Riddle was shot, and went to the house of the deceased early the next morning after he was shot. I asked the deceased, Riddle, who shot him, and he replied that Tom Coyle had shot him. I asked him how Coyle had shot him, and he replied that he had been to mill, and walked around the house with his meal, and threw it down, and went to Mrs. Coyle's room; when Tom Coyle was standing there with his gun, and shot him before he could move.'' The appellee obtained this conviction solely upon the alleged dying declarations of the deceased. Upon this question, the defense introduced three witnesses as follows:

Spicey Coyle, who testified: ''I am a sister of the defendant, and on the morning the shooting occurred my mother and sister, Mrs. Riddle, went with me to Nead Moore, and as we were leaving home Hubert Riddle, deceased, and husband of my sister, Mrs. Riddle, asked my mother to go to the house and tell Tom Coyle, her son, that he had to leave; but my mother declined to do so; whereupon Riddle said he would do it himself. My mother, sister and myself went to Nead Moore, and returned home about 1 o'clock, and Tom Coyle said Hubert Riddle had drawn a wagon standard on him, and told him he had to leave, and Tom had a gun in his hand, and said he guessed he could keep Riddle off him with this gun. My mother and I went to a neighbor's, Mr. Willis, and my sister, Mrs. Riddle, went to meet her husband.

About 4 o'clock we heard a gun shot at the house, and returned and found Hubert Riddle shot through the arm, and lying in the door of the hall. We placed him on the bed and sent for a doctor, but the doctor did not arrive until the next day about noon. I was in the room most all of the time, and I never heard Riddle make any dying statement; but, on the contrary, I heard him say he did not want the law to handle Tom Coyle, but he would settle with him when he got well. When the doctor arrived it was some time before he would consent to let him amputate his arm. After the operation he told his wife that she had a one-armed man now; but that he would manage to make her a living some way. He also said he and his wife would move to Ohio, and asked me to go with them."

Merrill Willis was next introduced for the defense, and testified as follows: "Mrs. Coyle and Spicey were at my house when we heard the gun shot at Mrs. Coyle's house, and I went up there with them When I went into the room where Hubert Riddle was I asked him if he knew Tom Coyle had a gun, and he said 'yes'; then I asked him why he went on him, and he said, 'I thought he was too d——n big a coward to shoot.' "

Robert Freeman was introduced by the defense, and testified as follows: "I was at the house where Hubert Riddle was nearly all the time after he was shot, and I did not hear him make any dying statement of any kind, but, on the contrary, he expressed hopes that he would soon be well."

The court gave the usual instructions in such cases, and, in addition, gave the following: "As to the statements testified to by some of the witnesses, as having

been made by Hubert Riddle after he was shot; and before he died, as to the circumstances connected with the shooting, the jury are instructed that they should not consider that testimony as evidence against or as evidence affecting the defendant, unless they believe from the evidence beyond a reasonable doubt that such statements, if made by Riddle at all, were made at a time or times when Riddle was under a sense of impending death, and when he had no hope of recovery and believed that he would die as a result of the wound he had received." The appellant reserved exceptions to this instruction, and the introduction as evidence of the dying declarations. The instruction was erroneous; the court should not have submitted to the jury the question as to the competency of this evidence; that was a question for the court to determine. This is a species of hearsay evidence, and is permitted only when the declaration is made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced, by the most powerful considerations, to speak the truth, and is permitted only upon the ground of the public necessity of preserving the lives of the community, by bringing manslayers to justice. Before this character of evidence should be permitted to go to the jury, all the facts and circumstances, under which the declarations were made, must be shown to the judge, it being his province, and not that of the jury, to determine whether they are admissible. But after the evidence is admitted, its credibility is entirely within the province of the jury, who should weigh all the circumstances under which the declarations were made, including those already

proved to the judge, and to give the testimony only such credit as, upon the whole, they think it deserves. See sections 156 and 160, Vol. 1, Greenleaf on Evidence; Wyatt v. Commonwealth, 1 S. W., 196; 8 Ky. Law Rep., 55; Vaughan v. Commonwealth, 86 Ky. 434; 9 Ky. Law Rep., 644; 6 S. W., 153; and Commonwealth v. Lawson, 80 S. W., 206; 25 Ky. Law Rep., 2188 In our opinion this error in the instruction, of itself, did not prejudice the substantial rights of the appellant sufficiently to authorize a reversal.

The real question is, did the court err in permitting these alleged dying declarations to go to the jury as evidence? Were these facts and circumstances shown to the judge of the court sufficient to authorize him to determine that the deceased, when he made the declaration to his wife and brother, was in extremis, that every hope of this world was gone, and that every motive to falsehood or revenge was silenced? In considering this question, we must take the record as presented, although apparently imperfect and incomplete, or the parties were negligent in eliciting all the facts and circumstances that might have shed light upon the question. The substance of the evidence upon this point was that Riddle at about 7 or 8 o'clock in the morning of the day after he was shot said to his wife and brother he believed he was going to die, and after stating how diseased said he received the shot, the wife stated, but which was not corroborated by the brother, that he said "he was going to die," and gave as the reason the shot passed through his arm so near a joint. Neither of these witnesses professed to have heard the deceased say anything further on the subject at any time before his death.

In the case of Mathedy v. Commonwealth, 19 S. W., 977; 14 Ky. Law Rep., 184, Holliday was poisoned, and died in about 15 minutes after taking it. In the meantime he said "that he was going to die," and then made a statement of the facts. The court said that these statements should have been excluded from the jury, that they were not dying declarations, as it was shown that he desired to have a physician sent for, which indicated that he had a hope of living. In the case of Starr v. Commonwealth, 97 Ky., 193; 30 S. W., 397.; 16 Ky. Law Rep., 844, it was shown that John James, the person killed, stated that he would not get well; that he could not stand it much longer. The court said: "The question is, did this language indicate a sense of impending death? It does not appear that the deceased had been told that he could not recover, and he had lived for nearly seven months after being shot. The language seems to us rather that of discouragement than of a conviction of impending death." In Vaughan v. Commonwealth, 86 Ky., 431; 9 Ky. Law Rep., 644; 6 S. W., 153, the language of the declarant was "he believed he would have to die," and it was held insufficient to constitute a basis for the introduction of the alleged "declaration." "It is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible. The mere belief of the declarant that he will not get well, but that he will ultimately die from his injuries, is not sufficient to admit his declaration." 1 Greenleaf, Evidence, section 158. In the case of McHargess v. Commonwealth, 23 S. W., 349; 15 Ky. Law Rep., 323, this court said: "It is not indispensable in order to render

proof of dying declarations competent, for deceased to have stated that he was bound to die, and had no hope of recovery. The fact of impending death, and consciousness of it on part of a wounded person, may be proven by circumstances. The deceased was shot about the lower part of the stomach, and the wound was so large that the attending physician stated he could put both of his hands in it, and besides, the bowels were protruding. It is therefore plain the deceased believed he would die very soon, as he did, in less than one hour, and that he was utterly without hope of recovery." In the case of Vaughan v. Commonwealth, 86 Ky., 434; 9 Ky. Law Rep., 644; 6 S. W. 153; the deceased said "he believed he would have to die." The court in that case said: "But it is essential to the admissibility of these declarations, and is a preliminary fact, to be proved by the party offering them in evidence, that they were made under a sense of impending death. * * * It is the impression of almost immediate dissolution, and not the rapid succession of death in point of fact, that renders the testimony admissible. On the other hand, a mere belief that he will not recover from his injuries, but that he will ultimately die from them, is not sufficient to admit his declarations in evidence See 1. Greenleaf on Evidence, section 158. The language of the deceased, to the effect that 'he believed he would have to die," was nothing more than the expression of an opinion that the wound which he had received would ultimately cause his death. We are clearly of the opinion that this evidence was incompetent, and that its admission was prejudicial to the rights of the appellant."

In view of these authorities, and others, it is difficult

to determine, under the state of the record that exists in this case, whether or not the statement of Mrs. Riddle and Charles Riddle should have been permitted to be introduced as dying declarations. The wound was through the flesh of the arm; the bone was not fractured; after these statements he permitted his arm to be amputated, and then said to his wife, which is not contradicted, "you have a one-armed man now, but he would manage to make her a living in some way." And also said "he and his wife would move to the State of Ohio, and asked his sister-in-law to go with them, and he said "that he did not want the law to handle Tom Coyle, but he would settle with him, when he got well." We are however of the opinion that the case as presented did not authorize the court to believe that Riddle, at the time he made the declaration, was in extremis, or was fully impressed that every hope of this world was gone, and that every motive to falsehood or revenge was silenced. The court erred in permitting George Herd to testify as to statements made to him by Riddle with reference to the manner in which he received his wound. There was no proof showing that Riddle was in extremis at that time, nor was it shown whether they were made before or after the statements to Mrs. Riddle. The testimony of Herd was clearly hearsay, and not admissible as a dying declaration, and was prejudicial to the appellant, for it tended to support the testimony of Mrs. and Charles Riddle. On another trial the court should, in the absence of the jury, hear evidence of all facts and circumstances that the parties wish to produce, and determine what statements of the deceased, if any, were made in extremis, and permit those to be intro-

duced; and then the appellee should be permitted to introduce any statements made afterwards, if any, by the deceased for the purpose of lessening or destroying the force and effect thereof.

For these reasons the judgment of the lower court is reversed, and remanded for another trial in conformity with this opinion.