### Eversole v. Commonwealth.

(Decided February 18, 1914.)

## Appeal from Perry Circuit Court.

1. Evidence—Dying Declaration—When Competent.—To make a dy-
   ing declaration competent as evidence it must be made when the
   declarant is in extremis and has given up all hope of life; but
   whether this be so or not may be determined, not only by what he
   may say, but by his evident danger and by all the surrounding
   circumstances.   The injured party, however, need not in express
   words declare that he knows he is about to die or make use of
   equivalent language.

2. Evidence—Impeachment of Defendant—When Admissible.—After
   the defendant in a criminal prosecution shall have testified as a
   witness in his or her defense, the Commonwealth may, by the in-
   troduction of evidence in rebuttal, attack his or her general
   reputation for untruthfulness or immorality.   By becoming a
   witness in his or her own behalf the defendant opens the door
   for such attack, and in such case his or her general moral char-
   acter, as well as general character for truth or veracity, is a
   proper subject of inquiry.

3. Husband and Wife—Wife Cannot Be Forcibly Compelled By
   Husband to Leave Their Home—Right of Self Defense.—Authority
   on the part of the husband to chastise his wife does not exist, nor
   has the husband any right to compel the wife by force to obey his

wishes. her person being as sacred as his. So any attempt on his part to forcibly eject her from their home may be resisted by such force on her part, and no more, as is reasonably necessary to prevent such ejection; and if by reason of the force used by the husband in attempting to eject her from the home and the circumstances attending his act, the wife believes and has reasonable grounds to believe, that she is in imminent danger of death or great bodily harm at the hands of the husband, and that she has no other safe, or to her apparently safe, means of escape from such danger, then she has the right to use such force or means as appears to her to be reasonably necessary to protect her life or person from such danger, or to her apparent danger, even to the extent of shooting or killing the husband.

A. H. STAMPER, W. C. G. HOBBS, WOOTTON & MORGAN, HOGG & JOHNSON, W. C. EVERSOLE, JOHN B. EVERSOLE and HAZELRIGG & HAZELRIGG for appellant.

JAMES GARNETT, Attorney General, A. F. BYRD, and C. H. MORRIS, Assistant Attorney General for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Reversing.

The appellant, Emma Eversole, was tried in the court below under an indictment charging her with the murder of her husband, Mack Eversole, but by the verdict of the jury was found guilty of voluntary manslaughter, upon which judgment was duly entered fixing her punishment at confinement in the penitentiary not less than two nor more than twenty-one years; and from that judgment she has appealed.

She asks a reversal of the judgment on the following grounds: First, that the indictment was defective; second, that the circuit court erred in admitting as evidence the alleged dying declaration made by the deceased shortly after he was wounded and before his death; third, that the court erred in permitting evidence on rebuttal attacking appellant's reputation; fourth, that the court erred in instructing the jury; particularly in failing to instruct them as to her right to resist her attempted eviction from her residence by the deceased.

Before undertaking consideration of the grounds urged for a reversal, we deem it necessary to set forth the material facts of the homicide. We gather from the bill of evidence that appellant became the wife of the deceased, Mack Eversole, November 27, 1912. Each of the parties had been previously married and divorced. Appellant had become the mother of three children while

living with her first husband and of a fourth, born after she was divorced from him and before her marriage with Eversole. Eversole had lived long enough with his first wife for her to become the mother of seven children before he divorced her. From the time of Eversole's marriage with appellant until his death, which occurred September 19, 1913, they resided at his home, a place called Typo, in Perry county, where Eversole was a merchant and farmer. The relations between appellant and her husband appear to have been altogether agreeable for many months and until the divorced wife of the latter began to visit his store. This, however, caused no break in the relations between appellant and Eversole. During her residence with the latter as his wife she remained on good terms with his children by the divorced wife, and even suffered one or two visits to her home from the divorced wife of Eversole without complaint. At the time of these visits the divorced wife ate with the family of Eversole, but there was no conversation between the two women. The visits of the divorced wife to the store of Eversole became quite frequent and the night before the latter's death she spent at the store, Eversole remaining with her. On the following morning she went to a house in the neighborhood, got her breakfast, and a few hours later returned to the store. The same morning Eversole at a late hour went to his residence where appellant was, ate his breakfast, and, upon being asked by appellant where he had spent the night, according to her testimony, which was uncontradicted, frankly told her that he had spent it at the store with the divorced wife. After partaking of his breakfast Eversole complained of being sleepy and upon appellant's preparing the bed for him he retired and slept until his father came to his house and awakened him. The father remained but a short time before taking his departure. Before leaving the house, however, he and his son took a drink of whiskey together. Shortly after his father left Eversole went to his store, taking a quart bottle of whiskey with him, from which he had a drink before leaving his residence. Upon reaching the store he found the divorced wife there, who remained with him at the store until noon, at which time he sent word to appellant to prepare two dinners and send them to the store for him. Appellant refused to send two dinners, but sent one for

his use, and a few minutes later sent him by a colored girl a bucket of milk, which she had forgotten to send with the dinner. When the colored girl reached the store Eversole, who had become intoxicated, attempted to throw the bucket of milk through the door, but was prevented by the divorced wife from doing so; thereupon he gave both the dinner and milk to the colored girl, directing her to take them back to appellant and tell her, "God damn her to go to hell." Shortly thereafter he left the store with a double barrel shotgun in his hand and walked rapidly to his home where he found appellant in the kitchen. He immediately asked her why she had not sent the two dinners to him as directed. She replied, apparently without anger, that she had sent his dinner. When this reply was made by her it seemed to so infuriate him that he ordered her to leave the house, saying: "God damn you, go and go now," and when she then said to him: "I haven't done anything and am not going," he struck her with the gun on the side of the head, saying: "I will kill you." She attempted to escape him by going into another room, but he followed and again struck her with the gun; whereupon, with a pistol then, or previously obtained from where it was kept by him at the head of his bed, she fired several shots at him, in rapid succession, two or more of which took effect in his body, one of them entering the abdomen; and from the shot received in the abdomen he in an hour and a half or two hours later died. When appellant began to shoot Eversole threw the shotgun down and attempted to take the pistol from her, and in the scuffle which followed they got to the front door and out on the porch, upon reaching which he exclaimed: "I am killed," turned her loose, walked into the house and laid down on the bed. Appellant followed him into the house and, finding that he did not speak, she took her little eight-year-old son by the hand and with him left the house.

What has been related as to the occurrences in the house was furnished in the main by the testimony of appellant, in much of which she was corroborated by her son, Mary Williams, an old colored woman, and the daughter of the latter. The boy and Mary Williams heard a large part of what was said by Eversole in ordering his wife to leave the premises, and the threat to kill her; and several other witnesses saw him leave the

store with the shotgun in hand and that he walked rapidly until he reached and entered his residence.

On the other hand, numerous witnesses were introduced by the Commonwealth who saw appellant and her husband when they reached the porch immediately after the shooting, where they were apparently scuffling over the pistol. One of these witnesses testified that on the morning of the shooting, or the day before, he had a conversation with appellant in which she made complaint of the conduct of Eversole and his divorced wife and said in substance, that if they came about her, or didn't stop it, she would make it hot for them; and another witness testified, in substance, to a similar declaration previously made by appellant.

Appellant's complaint of the indictment cannot be sustained. It is in the usual form, its averments embracing every element necessary to constitute the crime of murder.

Appellant's complaint of the admission of the dying declaration of the deceased is equally groundless. The statement in question was, in substance, as follows: That he went into the house and sat down on the trunk by the fire-place; that he didn't know his wife was mad, and when she came into the room she closed the door as she passed through it, walked to where he was sitting on the trunk near the other door, closed that also and immediately began to shoot at him; that he had not done a thing to her and did not know she was mad until she jabbed the pistol against him and fired; that she fired five shots and he thought they were all in him, but that the first shot killed him. Deceased lived an hour and a half or two hours after he was shot, and we think it fairly apparent from the evidence that at the time he made the foregoing statements as to what occurred at the time of the shooting, he had no hope of recovery and believed his death imminent. At the time of making them he said to several witnesses whose testimony appears in the record, that he was killed. To his father he said it was the last time he would ever come to see him. To Joe Coombs he said: "Brother Joe, I am killed." Coombs said to him: "Maybe you are not," to which deceased replied: "I know I am killed." Coombs then examined the wound in the abdomen, which deceased could himself see, and said to deceased: "I believe you

are killed, Mack, if you have got anything to say you had better say it;'' whereupon deceased made the statements mentioned above. It will thus be seen that not only did the deceased express his belief of impending dissolution, but that Coombs gave him advice which must have strengthened that belief into a conviction. To make such a statement as that coming from the deceased, admissible as a dying declaration, it must be made when the party is in extremis and has given up all hope of this life; but whether this be so or not, may be determined, not only by what he may say, but by his evident danger and by all the surrounding circumstances. The injured party need not in express words declare that he knows he is about to die or make use of equivalent language. Tested by this rule we think the statements made by Eversole were made under a sense of impending death and that what he then said also shows he was not only conscious of that fact, but of what he was saying as to the transaction, whether true or not. People v. Commonwealth, 87 Ky., 487; McHargis v. Commonwealth, 15 R., 323; Pennington vs. Commonwealth, 24 R., 321; Jones v. Commonwealth, 20 R., 325; Terrell v. Commonwealth, 13 Bush, 246; 1st Greenleaf, Sec. 158.

We find no merit in the appellant's third complaint. The evidence introduced by the Commonwealth in rebuttal to impeach appellant as a witness would not have been admissible as evidence in chief; but when appellant became a witness and testified in her own behalf, which she did not do until after the Commonwealth had concluded its evidence in chief, it was then competent for the Commonwealth, by the introduction of additional evidence, by way of rebuttal, to attack her general reputation for untruthfulness or immorality. Indeed, the introduction of such evidence is expressly allowed by section 597, Civil Code, equally applicable to criminal prosecutions, which provides: ''The witness may be impeached by the party against whom he is produced, by contradictory evidence, by showing that he has made statements different from his present testimony, or by evidence that his general reputation for untruthfulness or immorality renders him unworthy of belief; but not by evidence of particular wrongful acts, except that it may be shown by the examination of a witness or record of

a judgment that he has been convicted of a felony.'' By becoming a witness in her own behalf, therefore, appellant opened the door for the attack made upon her general reputation and in such case the general moral character of the witness, as well as his or her general character for truth or veracity, is a fair subject of inquiry; but not general character as to any particular acts of ignominy or turpitude. For the reasons indicated the trial court did not err in permitting the introduction of the evidence complained of.

Appellant's fourth and final contention must be overruled in part and sustained in part. Insofar as it complains of the instructions that were given by the trial court it is without merit; for by them the jury were correctly told in what state of case they would be authorized to find the appellant guilty of murder or voluntary manslaughter, and what punishment they might inflict for the first named crime; also what would justify the application of the law of self-defense as to one of appellant's grounds of defense; while in and through them, separately and as a whole, ran the admonition to the jury to allow the appellant the benefit of every reasonable doubt in the matter of determining her guilt or innocence, or, if they found her guilty, in determining the degree of her offense. But in view of the evidence furnished by appellant's testimony and that of several of her witnesses, that deceased ordered her to at once leave the house, threatened to kill her if she did not do so, and, upon her refusing to go, immediately assaulted and struck her with the gun as if to forcibly compel her to leave the house or to kill her, the court should have given the following additional instruction:

The jury are further instructed that appellant had the right, equally with her husband, Mack Eversole, to live and remain in the house occupied by them as a home, and the husband had no right to foricbly evict her therefrom; and if they believe from the evidence that the husband ordered defendant to immediately leave the house, and that upon her refusal to leave it, if she did so refuse, he attempted to drive her from the house by threatening to kill her and forcibly assaulting and striking her with a gun, she had the right to resist and prevent such assault or attempted ejection, by the use of such force, and no more, as was necessary or appeared

to her to be reasonably necessary to that end; and if in so doing she had reasonable grounds to believe and did believe she was in imminent danger of death or great bodily harm at the hands of her husband, and that she had no other safe or to her apparently safe means of escape from such danger, then she had the right to use such force or means as to her appeared to be reasonably necessary to protect her life or person from such danger or to her apparent danger, even to the extent of shooting or killing her husband; and if the jury believe from the evidence that the latter met his death under such circumstances and in the manner predicated in this instruction they should acquit the defendant.

"Whatever may have been the rule formerly, the authority on the part of the husband to even moderately chastise his wife is now expressly repudiated, and all such punishment is regarded as an assault and battery for which he must answer criminally. The husband has no right to compel his wife by force to obey his wishes. Her person is as sacred as that of her husband, and the protection offered by law to the one should not be denied to the other; but he may defend himself against her and may restrain her from acts of violence towards himself or towards others. The mother may interfere by force, if necessary, to do so, to protect her child from cruel treatment or wanton chastisement or abuse by either the stepfather or father, but her right to interfere depends upon the fact whether the father has exceeded the just limits of parental authority in the extent and character of the chastisement which he is administering to the child. If he has, the wife, by interfering for the protection of the child, does not become an aggressor, and should the husband repel such interference by an assault upon the wife, he is in the wrong and must be regarded as an assailant and treated as a wrong-doer. If, however, the chastisement of the child does not exceed the just limit of parental authority, the interference of the mother would be unwarranted and the father is fully justified in using all reasonable and necessary force to protect himself and restrain and prevent her interference." Roberson's Criminal Law, Vol. 2, Sec. 540; Carpenter v. Commonwealth, 92 Ky., 452.

The wife is neither the husband's mistress nor slave, nor can she forcibly be compelled by him to submit to

inhuman treatment at his hands, and if the courts should sustain the husband in such conduct, it would be but a mockery of justice. As the case must again be tried, we express no opinion as to the weight or effect of the evidence.

For the reasons indicated the judgment is reversed for a new trial consistent with the opinion.