## Postell v. Commonwealth.

(Decided February 27, 1917.)

Appeal from Christian Circuit Court.

1.   Homicide—Dying Declarations.—Where the deceased received a fatal blow upon the head and was rendered unconscious and re-

mained so for three or four days when he was operated upon, and a portion of the skull removed and infectious matter removed from the brain restoring him temporarily to consciousness, during which he made a statement that he did not believe the doctors and nurses would pull him through, or that he would get well, and he died within about twenty-four hours thereafter, statements which he made under such circumstances as to how the accident happened and identifying the defendant as the perpetrator of the crime are admissible as dying declarations.

2. Criminal Law—Dying Declarations.—It is error for the court to state to the jury upon the admission of the dying declaration that what the witness has stated shall be taken by the jury and weighed by it as though it had been testified to by the deceased in person before the jury, as this relieves the jury of passing upon the credibility of the witness testifying to the dying declaration.

W. O. SOYARS and L. K. WOOD for appellant.

M. M. LOGAN, Attorney General, and CHARLES H. MORRIS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant, Frank Postell, prosecutes this appeal from a judgment of the Christian Circuit Court, sentencing him to death for the murder of J. J. Robertson, by striking, beating and wounding the deceased with a stick, stone or other blunt, deadly instrument, from which he died within a few days thereafter. The crime was committed some time in the afternoon of February 11, 1916, a short distance out of the city of Hopkinsville, and on or near the track of Illinois Central Railroad.

Several errors are complained of on this appeal, but only two are really urged by counsel for appellant, and, as we conceive it, are the only ones demanding a consideration at our hands. They are: (1) that the court erred in admitting as evidence before the jury the alleged dying statement of the deceased, Robertson; and, (2) error of the court in giving to the jury, upon its own motion, at the close of the testimony of the witness who told of the dying declaration, this admonition or instruction: "The court will say to the jury that you will consider the evidence of Mr. Duncan as to what the deceased, J. J. Robertson, said as to the identification, and the statements made by him as to how it happened, how the trouble happened; you will take that as the evi-

dence of the deceased, Robertson, as though he were present and testifying.''

To understand the points raised it is necessary that we give a brief statement of the facts as shown upon the trial by the Commonwealth. The appellant had been staying in and around Hopkinsville since about the first of January, 1916. Up to that time it appears that he was a stranger in that community, and it is not shown what business, if any, he followed. He was reared in the southern part of Christian county or just across the line in Tennessee, where his mother lives, and as far as we can gather, during his stay in Hopkinsville he frequented saloons and no doubt indulged in considerable drinking. At any rate, on the morning of February 11, or a day or two prior thereto, the deceased, Robertson, appeared in the city and made it known that he either wanted to rent a farm or to purchase one, and was making inquiry of different ones in regard to these matters. He lived in Tennessee, but it does not appear that the appellant ever met him before or knew him. Some time about eight o'clock, on the morning of the day upon which the crime was committed, the deceased went into a saloon at Hopkinsville and the appellant either went into it with him or was immediately thereafter in the saloon when deceased was buying drinks for both himself and appellant, and there appeared to be a degree of familiarity existing between them. This, at stated intervals, continued until up to and perhaps past ten o'clock. In the meantime the deceased had purchased a half pint or a pint of whiskey. Some time, while they were in the saloon, the appellant, who is colored, spoke to another colored man or boy in the saloon and said to him that the old man (deceased) had a roll of money on him and that he (appellant) was going to get it or take it away from him, or something to that effect, and he wanted the other colored man or boy to assist him in getting possession of the money, but he declined to join in the undertaking. After the deceased and appellant had left the saloon, ostensibly for the purpose of going out in the country and looking at some land which appellant professed to know about, the two were seen together in another part of the city by the same colored person who was approached by appellant for the purpose of enlisting assistance in procuring the money of deceased. At the time appellant

and deceased were seen on the streets after leaving the saloon the appellant was pointing his finger in the direction of different roads or pikes leading into the city, but the witness who testified about this occurrence was not near enough to hear what was being said. This is the last seen or heard of either the deceased or appellant until some time between two and three o'clock that afternoon, when a farmer was coming to town, walking upon the track of the Illinois Central Railroad, and a mile and a half or more from town near a trestle he saw the deceased and appellant sitting upon the ties of the track on opposite sides. Some few words were passed, but they are not material, and the witness came on to town, seeing no more of the parties. About three thirty of the same afternoon, another farmer and his son who were at work nearby, burning a plant bed, saw the deceased wandering around, apparently lost, and also apparently insane or partially demented, and upon going to him they found that instead of having a bandana handkerchief over his head, as they thought, it was bloody, and he was wet all over, as though he had been submerged in a pool of water. He was very much chilled, and the witnesses carried him to the house of a neighbor, where, after being warmed and attended to for a while, he was carried to the city of Hopkinsville and delivered to the police of that city. The city physician treated him for three or four days, and he was then carried to the Jennie Stewart hospital, located in the city, and which is in charge of Dr. J. G. Gaither. Shortly after being carried to the hospital, the skull of the deceased having been fractured and crushed just above the left temple by the blow which he received from his assailant, he was subjected to a trephining operation by Dr. Gaither. There were other bruises upon his head, but not necessarily fatal ones.

The deceased, who was a white man, lived two or three days after the operation, but was unconscious from the time he was found wandering around in the field until some ten hours or more after the operation. There was removed from the brain by the operation a considerable amount of pus, or yellow matter, and the physicians say that his death was produced by the blow he received, and that it was almost necessarily fatal, the operation having more for its purpose the restoration of the deceased to his normal mental condition than to

effect a final cure. Something like a day and a half after the mental condition of the deceased was restored, he continued in that condition, but again relapsed into a state of unconsciousness from which he never recovered. It was during the lucid interval just mentioned that he made the statement which was admitted as a dying declaration, and of which complaint is made.

There are other circumstances found in the record tending to establish the guilt of appellant but not bearing upon the questions in hand, and with which we will not encumber this opinion.

When the deceased was taken to the hospital he was put in the same room with the witness, Duncan, who testified to the alleged dying declaration. He remained in the room with Mr. Duncan all the time, except when he was operated on, and was returned to that room after the operation. For the sake of brevity we will not insert the testimony of the witness, Duncan, bearing upon the condition of the deceased, and showing his sense of impending death and upon which his declaration was admitted, but will say that it shows substantially these facts:

That after the operation the two remained in the room some two or three days, and during that time, after the deceased regained consciousness, the parties engaged in several conversations. The witness says that the deceased was apparently sane and rational, as did Dr. Gaither, also, and that after emerging from the effects of the anaesthetic the witness asked the deceased how he was feeling, and he said "very sore," whereupon he was told that he would feel better after awhile. Witness then asked him where he was, and he replied that he was upstairs in some sort of a shack, but this was corrected and he was told that he was in a hospital; the deceased then said that he knew he was in a hospital, and that the doctors and nurses were trying to put him in good shape, but he was afraid they were not going to do it, and then said that he would fix the fellow who had wounded him. After this there was another conversation in which he again informed the witness that he did not believe the doctors would pull him through, that he did not believe he would get well, although he did not say that he believed he was going to die. After making these statements, the appellant was brought by the police to the room occupied by de-

ceased, and was identified by him as being the man who had assaulted him; but before this identification, and after the conversation above related, he made the statement which the court permitted to be introduced before the jury, and which statement is as follows:

"He said he went in the saloon and got a drink, and met several people and told them he was in Hopkinsville for the purpose of renting or finding a home, a farm, and he was told there was a farm on the railroad, and some colored man came to him and told him he knew where the place was and would take him out there, and he made an engagement to meet this man two or three hours later. That he went out to look at the farm, and there was no one living on the place, the house was empty, and they started back to town, and after they passed one of the trestles they came to a narrow path, and he walked in front and the colored man came behind, and the next thing he knew he got a blow across his head, and showed me the place, and he fell and received another blow on the head; and he then fell down the embankment and into the creek, in which he said there was probably three feet of water. The coldness of the water revived him and he managed to wade out, were the words he used, and he remembered no more until he found himself in the hospital."

There were other witnesses who testified as to the identification of the appellant by the deceased.

It is contended that the evidence fails to show that the dying declaration was made under a sense of impending dissolution, or *in extremis,* which is necessary, under not only the opinions of this court, but of all other jurisdictions so far as we are aware, to entitle the statement to be admitted as a dying declaration. It is unnecessary for us to encumber this opinion with authorities to show that the reason for the requirement that the statement should be made under such solemn circumstances, is that the declarant, being thus faced with immediate or almost immediate death, is under as much sense of obligation to speak the truth as though he were testifying under oath. In other words, that the solemnity of the occasion and the seriousness of the declarant's condition take the place of a duly administered oath. So that the authorities everywhere hold that the facts and circumstances must show that such condition exists in order to admit the statement as a dying declaration.

The question has been before this court a great number of times, and it is recognized in all of the cases that whether or not the circumstances are sufficient to admit the statement as a dying declaration is not only a question for the court, but is to be determined from the facts and circumstances of each case. Many of the cases hold that the declarant need not say in express terms, or in substance: "I believe, or I know, that I am going to die." If what he says, coupled with his condition, the nature and extent of the wound, the rapidity with which death follows, and other circumstances are sufficiently convincing that the declarant is confronted with the specter of death, his statements made at such time are admissible as his dying declaration. We are fully aware, also, as was stated in the case of Baker v. Commonwealth, 106 Ky. 216, that this character of evidence is a species of hearsay testimony, and liable to great abuse and should be received with great caution, and as was also held in that case, the declarant should believe himself beyond the probabilities of recovery. There are almost numberless cases from this court holding to the same rules, to which it is unnecessary to refer or discuss in this opinion. The cases chiefly relied on as authority against the admission of the statement are those of Mathedy v. Commonwealth, 14 Ky. Law Rep. 184; Starr v. Commonwealth, 97 Ky. 193; Coyle v. Commonwealth, 122 Ky. 781, and Commonwealth v. Johnson, 158 Ky. 582.

In the Mathedy case the decedent had taken some poison. It could not, in the very nature of things, be known whether it would prove fatal, and although he stated that he was going to die, yet he insisted upon sending for a physician, which could have been for no other purpose except to destroy the effects of the poison, and to restore the deceased to his previous healthy condition. The court there said that under such circumstances the statement was not made under such a sense of impending death as to warrant its introduction before the jury.

In the Starr case the deceased had been shot, but it is not shown that it was necessarily fatal, as was the wound in the instant case, and he made a statement that he would not get well and that he could not stand it much longer, and the court said:

"It does not appear that the deceased had been told that he could not recover, and he had lived for nearly seven months after being shot. The language seems to us rather that of discouragement than of a conviction of impending death."

In the Coyle case the deceased was shot through the fleshy part of one of his arms, about four inches below the shoulder joint, and no bones were fractured. There was absolutely nothing from the wound itself to indicate that death would ensue, but complications set up and the arm was amputated, after which he said to his wife: "You have a one-armed man now, but I will manage to make you a living in some way." He also said that he and his wife would move to the state of Ohio, and asked his sister-in-law to go with them. The statements upon which the Commonwealth relied to admit the declarations were, as testified to by the witnesses, that he said to his wife that he believed it would kill him because the wound was so close to the joint, and to another witness that he believed he was going to die, and to others substantially the same. Taking the statements, coupled with the facts and circumstances, including what he said to his wife about being crippled, and going to move to Ohio, this court determined that there was not shown sufficient solemnity surrounding the statement to permit it to be introduced as a dying declaraton.

An examination of the other cases will show facts and circumstances which influenced the court to reject the testimony. There are many cases from this court where the facts and circumstances do not appear to be so strong in favor of the admission of the testimony as those appearing in the case now under consideration. Peoples v. Commonwealth, 87 Ky. 487; McHargess v. Commonwealth, 15 Ky. Law Rep. 324; Commonwealth v. Matthews, 89 Ky. 287; Eversole v. Commonwealth, 157 Ky. 478; Farley v. Commonwealth, 165 Ky. 600, and Cavanaugh v. Commonwealth, 172 Ky. 799.

In the McHargess case, before making the dying declaration, the deceased said: "It is an awful fix for one to be in without warning." He was shot in the stomach, and from the nature of the wound and his statement above, this court determined that what he afterwards said as to the circumstances surrounding the commission of the crime was properly admitted, al-

though the deceased had made no statement concerning the death, or concerning his belief as to the result of his injury.

In the Cavanaugh case, quoting with approval from the Peoples case, the court said:

"The law does not require as a condition to the competency of the statement as a dying declaration that the injured party shall, in express words, declare that he knows he is about to die, or that he shall make use of equivalent language. His recognition of impending dissolution may be shown in this way, but the law does not limit it to this mode alone."

A further reference to, or quotation from, authorities would render this opinion too long, for enough has been said and a sufficient reference to the authorities has been made to show the general rules governing the subject. After all, each case must depend upon its own facts, and if it is shown by the testimony, from circumstances, or from what the declarant may have said, or from both, that the offered statement as a dying declaration was made at the time when the declarant was *in extremis;* and believed that he was approaching impending dissolution, it is admissible.

In the instant case the deceased had received a wound sufficient in severity to render him unconscious from the start, in which condition he remained until he was relieved by medical assistance. He expressed a disbelief in the ability of the physicians and nurses to give him relief, and said that he entertained no belief that he would get well. Within a very short time after that, he died. After giving the question thorough consideration, participated in by all the members of the court, we have concluded that the statements of the deceased, made under such circumstances, were properly admitted as his dying declaration, and that the court did not err in so ruling.

As a part of the first objection urged for a reversal of the case is the admission of the testimony as to the deceased identifying the appellant as the one who struck him. But little need be said in favor of the propriety of the court's ruling in admitting this testimony. Such identification is admissible, according to all authorities, under at least two sets of crcumstances: (a) when the identifying evidence is a part of the *res gestae;* and, (b) when it is a part of a valid dying declaration. Many

authorities of respectable standing also permit evidence of the identification to be introduced when the defendant was present and did not deny the statements of the declarant as to his (defendant's) guilt. We do not deem it necessary to discuss any of these, except to say that the identification in this case was made by the deceased under the same circumstances as his statement testified to by the witness, Duncan, as a dying declaration. In 21 Cyc. 989, in discussing evidence which may be admitted as a dying declaration, it is said:

"Positive statements as to the identity of the malefactor are always admissible in evidence when the deceased was in a position to know the fact stated." See, also, Henderson v. Commonwealth, 24 Ky. Law Rep. 1985. So we find no error in the ruling of the court in admitting the evidence in question.

Coming now to the second contention for a reversal, alluded to above, viz.: The statement the court made to the jury at the close of the testimony of the witness, Duncan, in regard to the weight they should give to the statements of the deceased as testified to by the witness, we are clearly of the opinion that there can be found no authority sustaining the action of the court complained of. On the contrary, we are convinced that the effect of the court's action, although unintentional on its part, was to destroy one of the fundamental rights of the defendant to have the jury find him guilty, if at all, beyond a reasonable doubt. The accused is presumed to be innocent until proven guilty beyond a reasonable doubt, but the presumption was denied to the appellant here as a necessary consequence of the court's statement. There appears in the statement not only the error of directing the attention of the jury specifically to certain parts of the testimony, but the jury are also told, in substance, to accept as true and as a fact, that the deceased made the statements attributed to him by the witness Duncan. Whether he made such statements is a question for the jury to determine from the evidence beyond a reasonable doubt, and under the same rule it is to determine whether such statements, if made, are true. Under the plea of not guilty the burden is on the Commonwealth to prove beyond a reasonable doubt every fact necessary to a conviction, and the jury must find every necessary fact to be true beyond a reasonable doubt before they are authorized to convict.

After the court has determined that the statements of the deceased, offered as a dying declaration, are admissible as such, there remain two facts for the determination of the jury, which are: (1) were the statements attributed to the deceased in fact made? And (2) if made, are they true? The jury must answer both in the affirmative from the evidence beyond a reasonable doubt before it can accept or be influenced by the alleged dying declaration. The court in this case, by the admonition given, took away from the jury its right to pass upon the first question above, and told it that the statements attributed to the deceased were in fact made, and that the witness, Duncan, was telling the truth beyond a reasonable doubt, thereby not only invading the province of the jury but depriving the defendant of a right as ancient as the common law. The error of the court in this particular is not seriously denied, as it could not well be, by able counsel for the Commonwealth in his presentation of the case.

We are not without authority as to the error of the court's action in this particular. The almost identical question was before the court in the case of State v. Valencia, 52 L. R. A. (N. S.) 152. In condemning an instruction embodying the same idea as is contained in the language of the court in this case, it is said:

"The serious infirmity about this class of evidence, i. e., dying declarations, is the lack of opportunity to investigate the truth of the same by searching cross-examination. And it can well be urged that the passion of the moment, or the clouded mind resulting from the injury, not to say anything about the possible incorrect quoting of deceased by those depended upon to support this evidence, would all tend to indicate the lurking evils of this class of testimony, to which the jury is prone to attach great consideration, for which reasons instructions tending to point out the weight to be attached to such evidence are dangerous and calculated to be highly prejudicial to defendant."

In a note to that case, upon the question now being discussed, we find this:

"The question whether the declaration was actually made is for the jury, and includes also the question as to the credibility of those testifying to it, and as to whether it has been correctly reported. Fogg v. State, 81 Ark. 417, 99 S. W. 537; People v. Amaya, 134 Cal.

531, 66 Pac. 794; Oliver v. State, 129 Ga. 777, 59 S. E. 900; Jones v. State, 130 Ga. 274, 60 S. E. 840; Commonwealth v. Lawson, 119 Ky. 765, 80 S. W. 206; Jackson v. State, 94 Miss. 83, 47 So. 502.''

To the same effect is the State of Oregon v. Doris, 16 L. R. A. (N. S.) 660, and a very elucidating note upon the question now under consideration, as well as others growing out of the general doctrine of dying declarations may be found in Worthington v. State, 56 L. R. A. 353.

This court has spoken in condemnatory terms against the trial court telling the jury as to how it shall receive, or the credibility which it shall give to any particular testimony, and has recognized that it is for the jury to determine whether the deceased as a matter of fact made the statement attributed to him and admitted as a dying declaration.

In Commonwealth v. Lawson, 119 Ky. 765, upon the very question now in hand, it is said:

''But, after all, the question as to whether or not the declarant made the declaration as testified to, or whether it is true in whole or in part, or whether he made a declaration at all, are issues for the determination of the jury, and not for the court.''

In the case of Coyle v. Commonwealth, *supra,* it is said:

''But after the evidence is admitted, its credibility is entirely within the province of the jury, who shall weigh all the circumstances under which the declarations were made, including those already proved to the judge, and to give to the testimony only such credit as, upon the whole, they think it deserves.''

There is another matter which we feel we should mention. It appears in the motion for a new trial, that while the jury was considering the case it came into the court room and asked the court if a prisoner under a life sentence was subject, at any time, to a parole from the Board of Prison Commissioners. The court gave an affirmative answer to the question, and the jury retired to its room, and afterward returned the death verdict. This, if it occurred, was error, because the jury's verdict should not be influenced by what another department of the state government might or might not do, or had authority to do. It is to be guided only by the facts pertaining to the guilt or innocence of the accused, and the

law applicable thereto. But, as this is not shown by the bill of exceptions, we do not reverse the case because of it, mentioning it only for the guidance of the trial and other courts in the future.

Upon the authorities, *supra,* and the general principles of the law governing the determination of issues of fact in criminal cases there can be no sort of doubt but that the court, though inadvertently, committed a most prejudicial error in its admonition complained of, the necessary result of which was to materially prejudice the rights of the defendant, and because of which we are compelled to reverse the judgment.

Wherefore, the judgment is reversed, with directions to grant the appellant a new trial, and for proceedings consistent with this opinion. The whole court sitting.