## Meade v. Commonwealth.

(Decided June 19, 1928.)

### Appeal from Letcher Circuit Court.

1. Homicide.—In prosecution for murder of deputy sheriff by defendant in attempt to avoid probable arrest, evidence held sufficient to sustain conviction.
2. Homicide.—Fact that county judge and county attorney were instrumental in obtaining dying declaration did not render the declaration incompetent, in murder prosecution, where it was not shown that they insisted on the statement or in any manner attempted to induce deceased to act contrary to his own free will.
3. Homicide.—Where victim of homicide in making dying declaration stated that he realized he would not recover, additional statement that life was uncertain and that he might not get well did not render the declaration incompetent, whehter the additional statement was made before or after the declaration.
4. Homicide.—Statement of victim of homicide made several days before his death held competent as dying declaration, in murder prosecution, under evidence showing that victim had abandoned hope of recovery at time declaration was made.
5. Homicide.—Statements of victim of homicide are admissible as dying declarations, only when made in extremis, and when victim has given up all hope of this life.

6. Homicide.—In determining whether statement of victim of homicide is admissible as dying declaration, court is not confined to bare statement of deceased, but may consider surrounding circumstances, and victim need not state in express words that he is going to die, provided words are used from which it can clearly be discerned that he realizes impending dissolution.

7. Homicide.—In murder prosecution admission as a whole of dying declaration of victim held not prejudicial, where statement was not contradictory, though it contained conclusions, and also contained some matter which was not a part of res gestae.

8. Homicide.—Statement of victim of homicide in dying declaration that "he had said he was going to kill me, but I didn't know it," was incompetent.

9. Criminal Law.—Where objection is made and exceptions saved only to evidence as a whole, the party objecting and excepting cannot avail himself of some isolated part of the evidence as ground for reversal, if any part of it was competent.

10. Criminal Law.—In murder prosecution, defendant, who objected to introduction of victim's statement as a whole, could not secure reversal on ground that dying declaration contained statement that defendant had said he was going to kill victim, though such statement was incompetent.

11. Homicide.—Court should hear witnesses in regard to dying declaration and determine its competency out of presence of the jury.

FRANK W. STOWERS for appellant.

J. W. CAMMACK, Attorney General, and GEORGE H. MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming.

Newberry Meade, the appellant, on a Sunday morning in the summer of 1927, shot and killed Patrick H. Bates in Letcher county. He was charged with murder by indictment, and his trial before a jury resulted in a verdict of conviction. His punishment was fixed at 18 years' confinement in the penitentiary.

His counsel have filed in his behalf a carefully prepared brief, interesting in composition, astute as to the argument of facts and tactful as to the presentation of the law. An analysis and summary of the brief shows that two major errors, in the opinion of counsel, are relied on for reversal. One is that the verdict is flagrantly against the evidence, and the other is that the court erred in admitting what purported to be the dying declaration of Patrick H. Bates. The second alleged error is divided into six parts by counsel in their argument.

The appellant lived on Millstone creek about three miles above its mouth. Patrick H. Bates lived on the same creek about one-half mile below the home of Meade. Between the two on the same creek resided Kid Hall, nearer the home of Meade than of Bates. At the mouth of Millstone creek is Millstone, a town bearing the name of the creek, which is a station on the Louisville & Nashville Railroad on the North fork of the Kentucky river. A few miles above Millstone on the North fork of the Kentucky river is Kona another station on the same railroad, and which is located at the mouth of Boone, which is the point where Daniel Boone carved his initials on a beech tree by the river which were recently blocked out of the tree and donated to the museum in Washington. On the right of the river, that is on the left ascending, is an old county road running from Millstone towards Kona.

About one week before Patrick H. Bates was killed he had gone to the county seat of Letcher county, where he was appointed a deputy sheriff. There is evidence tending to show that Meade did not look with favor upon the appointment of Bates as a deputy sheriff, probably believing that he had been appointed for the purpose of spying out those who might be engaged in what is commonly known as moonshining, or bootlegging. When Meade heard that Bates had been appointed, it was testified to that he made a statement that he would be killed within less than a week. On the particular Sunday morning in question Meade, in company with one of his small sons and another small boy, left his home on the way down the creek to Millstone. As he passed the home of Kid Hall he joined Meade and the boys. When they passed the home of Bates, he and some of his boys were engaged in repairing a fence. They spoke in passing and proceeded on their journey towards Millstone. Bates discovered as they passed that some of them, probably the little son of Meade, had whisky in a bucket. He left his work and went to his home, obtained his pistol, and started down the creek to Millstone, but he did not overtake those in front of him before he arrived. When he arrived he made some inquiry, and he learned that Meade had separated from the others and was on the old county road leading from Millstone to Kona proceeding towards Kona. Bates followed Meade. About 30 minutes prior to the beginning of this Asahel-Abner like race, Meade went into a store and purchased a round of

cartridges. He was carrying a very small pistol compared to those generally in use, that is a 22-caliber. He purchased the cartridges at the store of Sandy Adams. After the purchase he started across the bridge and at that time he first discovered Patrick Bates at the station, who at the time was talking with one Taylor. Meade crossed the bridge and entered the old county road and proceeded towards Kona, where he was going to seek work, according to his testimony. He thus details what happened after he had entered the county road and started towards Kona:

"I happened to look back and seen Bates coming. He was coming walking pretty fast. I goes on up and gets right ferninst Tom Craft's and looks back and seen him in kindly of a little trot; I call it a fast gait. He keeps gaining on to me, and I walks pretty swift, and he sorter checks a little bit his gait, and he comes a little piece farther, raises another little shammick, I call it, kind of a little trot, and he gets up in a little distance from me, and he says, 'Stop there, Meade; stop there, Newberry; I am going to kill you;' and I wheels around, and says, 'What are you going to kill me for?' He never speaks. He never says I have got a warrant for you or what he had; he starts out with his—he pops his hand down this way on his belt or down this way, and he starts with his pistol, and got his pistol might near out; by that time I had mine on him; as I got mine out on him I fired the pistol, and after I fired the pistol he slided backward, sorter turned back, and when he runs back I had the pistol in my hand; I still kept going, walking away from him with my side towards him; I was afraid if he wheeled around he would shoot me in the back, and when I got ready to turn around a little curve and then I got out there until I thought I could get around that curve to keep him from shooting me, I breaks and runs, and I goes around there and out of the way there, looking every minute for him to shoot me in the back."

This story of appellant must be measured by the standard which he himself affords. He testified that there had never at any time been any disagreement between him and Bates; that he had no ill feelings towards Bates; and that Bates had no ill feelings towards him so far as he knew. With this light given us by appellant it

is strange that he admits he was walking rapidly when
he saw his friend getting up a "shammick" to overtake
him. It is also strange that his friend without saying
anything else to him commanded him to stop or he would
kill him, and there is a strangeness in the statement of
appellant that Bates did not tell him that he had any
warrant for him. It is true he had no warrant for him,
and, according to the theory of the appellant, there was
no reason why he should have had a warrant for him.

There was one eyewitness to the shooting, Mary
Ross. She saw Meade and Bates going towards Kona
and away from Millstone on the old county road, Meade
in the front and Bates walking rapidly after him. Both of
them were walking rapidly. She thought she heard some
one halloo "halt," but she was not certain about it, but
at the time Meade wheeled around and as Meade turned
around Bates put his hand on his stomach. At that time
he had his back to the witness and Meade was facing her.
As Meade turned he had his pistol in his hand and he shot
Bates before Bates drew a weapon. Bates, according to
this witness, did not pursue Meade further, but turned
around and passed by the witness and told her that he
had been shot.

The dying statement of Bates is as follows:

"As I passed down the road I saw three of them
walking along. They had a bucket and basket. His
little boy had the bucket and basket. In the bucket
I could see something sloshing and I knew it was
whisky. I went back up home to see if I could catch
up with them, because I knew they were going to
Millstone or Kona one. The three of them went up
the railroad and come back around and went up Mill-
stone creek a little ways. I was just fixing to get on
the train to go up to Kona and saw them pass along
by Jesse Holbrooks'. I just started out after them
and when I got in about twelve feet of him he turned
and shot me, and I never spoke any to him. No one
was with me. I was by myself. No one was with
me; I was just aim to walk along with him and go on
out there, and I made no arrest or said anything. He
shot me one time in the hand and in the stomach.
Neither of us spoke to each other. When he looked
around and saw me, he said, 'Don't you follow me
any farther;' and just about that time he shot me,
and I had no chance to get my gun. He had one of

these overall jackets on his arm. When he shot me, he came toward me for about ten feet, and I backed and put my hand up to get my gun; he walked backwards, and told me if I didn't drop my hand he would shoot me again. Just as soon as he got in the bend he begin to run, and I started after him, but I was afraid I was going to get sick from the shot, and he might shoot me again, so I turned around and come back. He had said he was going to kill me, but I didn't know it. During the time I was following him I didn't ever have my pistol out or make any attempt to injure Mr. Meade. At the time when he shot me we were both walking in the same direct, he was bout ten steps ahead of me. I was walking faster than he was and when I was about to overtake him he turned and shot me.

"Realizing that I am not going to get well, I make this as my dying declaration."

These quotations from the evidence are a complete answer to the contention that the verdict is not supported by the evidence. This point must be decided against appellant.

The question as to whether the dying delcaration should have been admitted is not so easily disposed of. Before the dying declaration was read to the jury one of the attorneys representing appellant asked permission of the court to cross-examine the witness Judge Bentley, who was at the time testifying about the dying declaration. An objection was made to the admission of the dying declaration, which was overruled, and a proper exception was saved. After it was read appellant moved to strike it from the evidence and to withdraw it from the consideration of the jury. This motion was overruled and an exception taken.

It is first argued that the method of obtaining the dying declaration renders it incompetent, in that the county judge and the county attorney were instrumental in procuring it. The judge and attorney had gone to the hospital to investigate the offense. This was about four or five days after Bates was shot. He died on the sixth day after the shooting. When they first saw Bates they did not obtain a dying declaration apparently for the reason that he did not appear to recognize his impending dissolution. On a later day they returned. On this second occasion a stenographer was procured and Bates

dictated the statement to him. It was written up by the stenographar and carefully read to Bates, who signed it at the time. He was sworn to it by the county judge. There is no evidence that either the county attorney or the county judge insisted on his making a statement or in any manner attempted to induce him to act contrary to his own free will. There is nothing in the manner in which the dying declaration was obtained to prevent its introduction as evidence if it was otherwise competent.

It is next argued that the evidence does not show that Bates had abandoned all hope of recovery when he made the statement. It is true that Judge Bentley testified that he remembered his saying that life was uncertain and that death was sure and that he might not get well, but he also stated that, while he did not recall exactly what the witness said on that point, he remembered clearly that the statement which he made was embodied in the statement itself. If that is true we find that he said in effect that he realized that he was not going to recover. It may be that Bates had said that life was uncertain and death was sure and he did not know whether he was going to recover, but that did not render his dying declaration inadmissible, if he thereafter changed his opinion and made statements showing that he realized that his dissolution was impending. If the statement was made after he had expressed his conviction that he was going to die, it would not render the dying declaration incompetent. Calico & Beasley v. Com., 206 Ky. 271, 267 S. W. 167; Lyons v. Com., 216 Ky. 202, 287 S. W. 534. Dr. Wright, the attending physician, testified that prior to the making of the dying declaration he had informed Bates that he could not recover and Bates had expressed his recognition of that fact. The statement was made a few days before Bates died. This did not render it incompetent. People v. Com., 87 Ky. 487, 9 S. W. 509, 810, 10 Ky. Law Rep. 517. The evidence in this case showing that Bates had lost all hope of recovery at the time he made the statement measures up to the rule announced in the case of Kelly v. Com. (Ky.) 119 S. W. 809. A statement such as this admitted as a dying declaration from the deceased must be made when he is in extremis and has given up all hope of this life. The court is not confined, however, to the bare statement of the deceased, but may take into consideration the evident danger and all the surrounding circumstances. It is not necessary that the person dying shall in express words state that he knows

he is going to die; but, if he makes use of words which are equivalent to such a statement and from which it can be clearly discerned that he realized that he is in extremis, the dying declaration should be admitted.  Eversole v. Com., 157 Ky. 478, 163 S. W. 496; Postell v. Com., 174 Ky. 272, 192 S. W. 39; Green v. Com., 18 S. W. 515, 13 Ky. Law Rep. 897; McHargess v. Com., 23 S. W. 349, 15 Ky. Law Rep. 323.

The court did not err in admitting the dying declaration, but there remains the question as to whether the court erred in admitting it as a whole without striking from it such parts as were incompetent.  It is urged that parts of the statement are conclusions, and not facts.  So far as that complaint is concerned, we may say in response to it that the statement is open to that criticism, but there is nothing in the conclusions expressed, which are very few, that was even slightly prejudicial.  It is also urged that the statement is contradictory, and that it shows on its face that Bates did not understand it, or did not have mental capacity to know what he was doing at the time.  The evidence is clear that Bates was in his right mind at the time he made the statement, and we do not find that the statement is contradictory in any material respect.  It is contended that it contains matter which was not a part of the res gestae.  There is such matter included in the statement, but in the main it is immaterial and could have had no effect on the mind of the jury, but there is one statement that may have been prejudicial.  We refer to the statement, "He had said he was going to kill me, but I didn't know it."  This was added to the evidence of another witness that appellant had used language in speaking of Bates which might be properly construed as a threat.  The statement was incompetent under the authority announced in many opinions in this court.  Caudill v. Com., 220 Ky. 191, 294 S. W. 1042; Mays v. Com., 200 Ky. 678, 255 S. W. 257.

But appellant is not in position to take advantage of this incompetent part of the dying declaration.  The exceptions to the introduction of the statement went to it as a whole, and there was no objection or exception to any particular part of it.  It is the general rule that, where objection is made and exception saved to the evidence as a whole, the party so objecting and excepting cannot avail himself of some isolated part of the evidence, if any part of it was competent.  In the case of Ellis v.

Com., 146 Ky. 715, 143 S. W. 425, the court announced this rule governing the question:

> "It is very clear that, if this evidence of the witness was incompetent, no proper or available objection or exception was taken to it, as the motion at the conclusion of the evidence to exclude from the jury 'the testimony of Mrs. Sallie Spencer' was not sufficiently definite to call the attention of the court to the particular answers in her evidence that counsel desired to object to. By all the rules of practice with which we are familiar, when objection is made to the whole of the testimony of a witness, without specifying any particular part of it, the motion should be overruled, if any of it is competent. If it is desired to save an exception to incompetent evidence that can be available upon appeal, the exception should point out the particular evidence objected to."

The rule announced in the Ellis case was approved in the case of Hall v. Com., 189 Ky. 72, 224 S. W. 492.

In the old case of L. & N. R. R. Co. v. Graves, 78 Ky. 74, it was held that an exception to a deposition which was general went to the whole deposition, and, if some part of the deposition was competent, the exception was properly overruled.

The case of Harrod v. Armstrong, 177 Ky. 317, 197 S. W. 816, was a case involving the competency of the report of the processioners. The court found that the report was competent as evidence in so far as it was within the scope of the duties of processioners; but, if it contained findings by the processioners where no duties were imposed upon them by law to make a finding, the report to that extent was incompetent. The court found that much of the report of the processioners was incompetent. The court said:

> "When the report was offered the defendant objected to it as an entirety, which objections were overruled, and the defendant excepted. Afterwards the defendant moved the court to withdraw from the consideration of the jury the report of the processioners offered in evidence herewith, and said objections being overruled, the defendant excepts. The uniform and unvarying rule as announced and adhered to by this court is that for an objection to be

available it must be specifically directed to that portion of the testimony which is incompetent, and that to object to evidence as a whole when there is contained in it both competent and incompetent testimony will not be sufficient to authorize this court to reverse the judgment because of the error complained of.''

16 Corpus Juris, p. 878, thus states the general rule:

''An objection to evidence as a whole is properly overruled where part of it is competent; the duty of separating the incompetent from the competent devolves on counsel and not on the court, and an objection to a volume of testimony must specifically point out the portion claimed to be incompetent.''

The cases cited in support of this text are numerous and among the cases cited are found some relating to dying declarations.

As the appellant objected to the dying declaration as a whole, he is not in position to rely for reversal on parts of it which may have been incompetent.

Many cases are reversed because of the improper admission of dying declarations. In every instance where a dying declaration is to be introduced, the court, before there is any reference made to it in the presence of the jury, should hear the witnesses in regard thereto and determine as to its competency, and, if parts of it are competent and parts are incompetent, that which is incompetent should be eliminated. It is unfortunate when the court allows a witness to testify in the presence of the jury about the statements of the deceased when later it may be necessary to hold that the dying declaration cannot be admitted. The competency should be determined out of the presence of the jury. We find no grounds for reversing this case.

Judgment affirmed.