## Huff v. Commonwealth.

(Decided Oct. 1, 1937.)

J. C. BURNETTE for appellant.

HUBERT MEREDITH, Attorney General. and JOHN M. CAMPBELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

On the evening of August 24, 1936, the appellant, John D. Huff, shot and killed Elisha Owens.

Upon his trial on his later indictment therefor, charging him with the murder of the deceased, he was found guilty of voluntary manslaughter and sentenced to twenty-one years' imprisonment.

The motion and grounds for a new trial having been overruled, the accused has appealed, earnestly asking a reversal of the judgment upon the following grounds: (1) That the verdict of the jury was not sustained by the evidence; (2) that the court erred in permitting the commonwealth, over the objection of defendant, to introduce incompetent and irrelevant evidence before the jury, prejudicial to his substantial rights; (3) that errors of law occurred during the trial; and (4) that improper statements were made by the commonwealth's attorney, which were outside the law and facts proven in the case.

This homicide occurred on Terry's fork of Jones creek, in Knott county, Kentucky.

It is the theory of the commonwealth that the deceased, Elisha Owens, was maliciously and willfully shot and killed by appellant, because of the latter's homicidal hatred of deceased and desire for revenge, caused by deceased's having sued him for a debt long owing, and repeatedly undertaken to attach his property and garnishee his wages to enforce its collection.

On the other hand, appellant, while admitting that he shot and killed the deceased, denies that he did so willfully or when motivated by hatred and desire for revenge, and testifies that he shot the deceased in his necessary self-defense, when the latter, upon this occasion, had come to his home drunk and was cursing and threatening to kill him, as he attempted to draw his weapon, but that he "beat him to it."

Appellant, by the second of the grounds assigned

for reversal of the judgment, complains that on the trial certain incompetent evidence was erroneously ruled to be competent and admissible as the dying declaration of the deceased, and which ruling, it is strenuously insisted, was, under the circumstances of the commonwealth's proof, so prejudicial to the substantial rights of the accused as to have resulted in denying him a fair trial.

This testimony, admitted over his objection as a dying declaration, appellant contends was incompetent, in that it failed to meet the test required for its admission as such.

The first of these statements, complained of as erroneously so admitted, was made by the deceased to the commonwealth witness Kendle Ramey, who testifies that he was near the scene of the shooting and heard it when it occurred, causing him to hurry to the place, which he reached in about five minutes, where he found the deceased, Elisha Owens, lying upon the roadside near his home, bleeding and badly shot; that upon his speaking to the deceased, he said to witness:

"Get me to the hospital as quick as you can. I am killed."

Witness, when asked if deceased had said how the trouble occurred, answered, "Not exactly," but that he had said, "Why did this man want to shoot me up and me only begging to him?"—which last part of the statement the jury was admonished not to consider.

Witness states that he then left the deceased and was gone for some twenty minutes, trying to arrange for removing him from "out of the hollow" to a hospital; that in a few minutes he returned to the deceased, where he found that several other of his neighbors had gathered at the scene of the shooting, some of whom also testify as to further statements they heard then made by the deceased in reference to the appellant's having shot him, and which were made after he had been given a drink of whisky by Ramey to relieve his suffering and rally him.

Witness Ramey says he does not clearly remember whether it was before or after deceased was rallied by taking this drink that he made certain further statements (admitted in evidence) to him, relative to his then condition, when making the statement as to the facts and circumstances of the shooting, but that they were made

after he came back to the deceased, as is also testified by another commonwealth witness, Winston Sparkman. He testifies that the deceased then said that John D. Huff (the appellant) had shot him, after which he added:

"'Why did the man want to shoot me up this way? I was begging and talking good to him.''

Witness Ramey also testified that when he asked deceased if he "made any attempts," he answered:

"No, sir, what did I have to make any attempts with? I didn't have any gun."

Winston Sparkman further testifies that he also was present at the scene of the shooting, arriving there some fifteen or twenty minutes after its occurrence, where he heard the deceased talking to the witness Ramey after his return from telephoning, and that some ten or fifteen minutes after he (Sparkman) had arrived there, the deceased was given a drink of whisky by Ramey, which seemed to somewhat relieve his suffering and after which he heard the deceased state that he "thought he would pull through"; that he remembered no further statement made by the deceased as to what he believed was then his condition nor did he hear him say anything about his dying.

In about an hour and a half after the deceased's making these statements, as to the shooting and that he believed he would "pull through," to Ramey there in the "hollow," where shot, deceased was carried to a nearby hospital, as he had requested. On his arrival at the hospital at about 8 o'clock, he was examined by the doctor and administered a "shot" to relieve his suffering.

Shortly thereafter deceased was asked by his kinsman, the witness Bennie Caudill, if he cared to make a statement, to which deceased replied: "Go away and leave me alone. I am going to get over this." However, a short while later he was again asked if he did not want to make a statement, when he then answered, "I don't care." Thereupon the deceased was questioned concerning the shooting, when the questions and his answering statements made were written down. This writing was, over the objection of defendant, permitted by the court to be introduced and read in evidence to the jury as the dying declaration of deceased. This written statement is as follows: "Elisha Owens states on oath that John D. Huff shot him and he was begging

to him to not shoot. He further states he had attached his time and 'he just walked up to me and shot me.'" This paper, it is agreed, was unsigned by the declarant, though read to and approved by him.

Timely challenges were made to the court's rulings upholding the competency of these several statements made by the deceased as to the shooting and their admissibility as his dying declarations.

The question of the propriety of these rulings, vigorously assailed, we will now consider.

Upon the trial of this case, the evidence for the commonwealth, tending to establish the defendant's guilt of the murder offense charged, especially when these statements of the deceased are excluded, was very meager, and the commonwealth, it appears, found its main prop and support in procuring a conviction of the appellant in the court's complained of rulings, in holding these statements competent and admissible in evidence as deceased's dying declarations. In such case, it logically follows that if these criticized rulings of the court were improperly made, by reason of these declarations not being shown to have been made under the belief of imminent death, the test required for their introduction as dying declarations, then their admission, being likely of decisive effect, must of necessity have been here both erroneous and highly prejudicial to the substantial rights of appellant.

The material or pivotal question, therefore, here presented is: Were these statements of the deceased, relative to the fact and manner of the shooting (here admitted in evidence), such in character and made by declarant under such condition "in extremis" as to render them competent and admissible as his dying declaration?

Looking to the determination of this question, it may be conceded that the general rule, controlling the admissibility of this character of evidence, is that dying declarations, being recognized as one of the exceptions to the rule rejecting hearsay evidence, are admissible as such only in cases of homicide, where the death of the deceased is the subject of the charge and the circumstances of the death are the subject of the dying declaration and, further, that "the declaration is not excluded by the circumstances that there are eye-witnesses to the deed, or other testimony; or that the fact of the killing

is conceded by the accused. * * * The persons whose declarations are thus admitted are considered as standing in the same situation as if they were sworn; the danger of the impending death being equivalent to the sanction of any oath." Greenleaf on Evidence, vol. 1, secs. 156a and 157, pp. 246 and 247.

The rule governing the admissibility in evidence of the statements of a deceased as his dying declaration is well and aptly stated in the case of Commonwealth v. Griffith, 149 Ky. 405, 149 S. W. 825, 826, as follows: For statements of the deceased, relative to the fact and circumstances of his receiving injuries resulting in his death, to be competent as dying declarations, they "must be made when the party is in extremis and has given up all hope of this life; but whether this be so or not may be determined, not only by what he may say, but by his evident danger and all the surrounding circumstance. The injured party need not in express words declare that he knows that he is about to die, or make use of equivalent language; but if any expectation or hope of recovery exists, however slight in the mind of the injured person, they are inadmissible." See also the pronouncement of this rule as given by section 158, page 248, vol. 1, Greenleaf on Evidence, and compare, in accord, its reiteration and application made in the cases, among others, of Eversole v. Commonwealth, 157 Ky. 478, 163 S. W. 496; Parker v. Commonwealth, 180 Ky. 102, 201 S. W. 475; Stewart v. Commonwealth, 235 Ky. 670, 32 S. W. (2d) 29; 8 R. C. L., sec. 45, page 87; Meade v. Commonwealth, 225 Ky. 177, 7 S. W. (2d) 1052; Shepard v. U. S., 290 U. S. 96, 54 S. Ct. 22, 23, 78 L. Ed. 196, the latter case declaring:

"To make out a dying declaration, the declarant must have spoken without hope of recovery and in the shadow of impending death."

Such being the rule controlling the admission of a statement of the deceased as his dying declaration, that the statement must in every instance be shown to have been made at a time when the declarant had abandoned all hope of recovery and that it was made in the belief that he was at the time of making it resting in the shadow of imminent and certain death, the question becomes: Were his statements here made, and permitted to be introduced as deceased's dying declaration, shown by the evidence to have been made under such indispensable conditions?

As to the first statement made by the deceased, declaring, "I am killed," such language would fairly manifest his belief that he was then speaking in extremis, if it had stood alone. However, when taken in connection with his further words, "Get me to the hospital as quick as you can," which might be interpreted as indicating some hope of improvement, the significance of the first statement, "I am killed," might thereby be weakened as one not made in extremis.

However, in Walls v. Commonwealth, 257 Ky. 478, 78 S. W. (2d) 322, we held that the declarant's expressing a desire to be taken to a hospital was insufficient to negative the inference that he was laboring under a sense of impending death, so as to render it inadmissible as a dying declaration. See also Turner v. Commonwealth, 268 Ky. 314, 104 S. W. (2d) 1087, approving and following this holding. But, as the statement did not purport to relate any of the facts or circumstances as to the shooting, tending to show the cause and manner of its occurrence, the province of a dying declaration, we conclude that, even if the statement as made and submitted as a dying declaration was erroneously so ruled, which we do not decide, it was without prejudice to the appellant, in that it was such in its character as to be ineffective for any purpose, in view of the further ruling of the court that deceased's added statement, "Why did this man want to shoot me up and me only begging to him?" should be excluded and the jury admonished not to consider it.

However, the further statements made by the deceased, which are assailed as having been ruled to be competent and admissible as his dying declarations, undertake to show what declarant then believed was his condition with respect to his imminent death, and also to state the fact and circumstances of his fatal shooting by appellant.

The evidence as to the conditions under which these statements were respectively made is, in the first case, that they were made after the declarant had been given a drink and had stated that he would "pull through," while his statement, later made at the hospital and taken down in writing, was made just a short while after he had there told those asking him if he wanted to make a statement to "go away and leave me alone. I am going to get over this." Also, the wit-

nesses testifying as to these statements said that the deceased, after making them, said nothing further negativing his belief that he would "pull through" or "get over" his injuries, or had, on the other hand, then abandoned all hope of living.

These statements of the deceased, which the court ruled competent and permitted to be introduced as his dying declarations, we conceive were erroneously so ruled and admitted, as it is shown by the evidence that they were made but a short while after the declarant had stated he expected to "pull through" or to "get over" his injuries, which clearly indicated that he was then not making the statement under the "shadow of impending death" or when he had abandoned all hope of recovery, which is stated, under the rules, supra, to be the indispensable condition and test for holding competent and admissible the statements of a deceased, purporting to detail the fact and manner of receiving his injuries, from which death resulted, as his dying declaration, and also that, to be such, the declaration is competent only in so far as it is confined to stating the facts and circumstances of the killing.

The evidence here clearly being insufficient to show that the statements, ruled by the court to be competent and admissible as the dying declarations of deceased, were made when the declarant had abandoned all hope of living, we conclude they were not competent or admissible, when measured by the test set forth in the above cited text and cases, as the dying declarations of the deceased, and, for such reason, are of the opinion that the court prejudicially erred in its ruling otherwise, for which error the judgment must be reversed.

Further, we are of the opinion that the court erred in permitting the writing, in which the witnesses had written down the declarant's statements relative to the occurrence of the shooting, and which writing, while approved, was yet unsigned by him, to be read to the jury, as was expressly held in the case of Eastridge v. Commonwealth, 195 Ky. 126, 241 S. W. 806, though the statements of the deceased, if otherwise competent, might be orally proven in evidence. Allen v. Commonwealth, 134 Ky. 110, 119 S. W. 795, 20 Ann. Cas. 884; Fuqua v. Commonwealth, 73 S. W. 782, 24 Ky. Law Rep. 2204; Saylor v. Commonwealth, 97 Ky. 184, 30 S. W. 390, 17 Ky. Law Rep. 100.

In view of the conclusion we have reached that the judgment must be reversed upon the grounds and for the reasons stated supra, we refrain from further intimating any opinion concerning the merit of the other points urged for reversal, but same are expressly reserved.

Wherefore the judgment is reversed for a new trial and further proceedings consistent herewith.