## Griffin v. Commonwealth.

(Decided October 10, 1924.)

### Appeal from Harlan Circuit Court.

1. Criminal Law—General Statement on Motion for Change of Venue Need Not be Accepted as True, though Not Denied Under Oath. —General statement, in affidavit filed on application for change of venue, that friends and relatives of decedent have threatened to lynch defendant, and that defendant's witnesses are afraid to testify, need not be accepted as true, though denial in response filed by attorneys for prosecution is not sworn to; it being impossible for Commonwealth to meet such general charge.

2. Criminal Law—Discretion Held Not Abused in Denying Change of Venue for Local Prejudice.—Court held not to abuse sound discretion in refusing application for change of venue, on ground of local prejudice and threats by friends and relatives of decedent.

3. Criminal Law—Court Held to have Erred in Refusing Continuance.—Where killing occurred March 31st, and on next day accused was arrested, indicted, and brought into court, and his case set for trial on April 4th, and on April 2d defendant announced he was unable to employ counsel, and counsel was appointed, and on April 3rd counsel were employed by his friends, and counsel appointed was permitted to retire on morning of April 4th, court erred in denying postponement until next week.

4. Criminal Law—Refusal to Postpone Case for Another Week Held Not Prejudicial Error.—Error in denying postponement to following week to enable counsel to consult client and witnesses held not prejudicial; trial having been delayed by necessity of summoning additional jurors, and record showing that defense was ably and strongly presented, and all witnesses attending.

5. Homicide—Actions and Conversation of Parties Before Shooting Held Admissible.—Evidence that deceased constable and brother, when investigating disturbance in mining camp, met defendant and asked him what was going on, and that he told them that there had been a holdup, and that deceased searched defendant and told him to leave town, held admissible to show motive, though killing occurred 45 minutes later.

6. Criminal Law—Accused Cannot Complain of Admission of Evidence as to Matter to which he Himself Testified.—Accused cannot complain of introduction of evidence that deceased, a peace

officer, had ordered him to leave town, where he testified to the same effect.

7. **Homicide—Evidence of Custom of Deceased Constable as to Running Men Out of Town Held Immaterial.**—In prosecution for murder of constable who, prior to killing, had told defendant to leave town, held, that court did not err in refusing to permit defendant to prove that it was not customary for decedent to run men out of town who violated law, but that ordinarily he arrested them; it being immaterial.

8. **Criminal Law—Not Prejudicial to Exclude Evidence as to Matter Otherwise Proved.**—It was not prejudicial to exclude evidence admissible only to show that decedent entertained hostile feeling toward defendant, where such feeling was proved, practically without contradiction, by several witnesses.

9. **Homicide—Court did Not Err in Refusing to Permit Defendant to Testify Decedent Tried to Get Him to Make False Charge Against Persons.**—In prosecution for murder of constable, court did not err in refusing to permit defendant to testify that decedent, some time previous to killing, tried to get him to make false charge against certain named persons, where defendant was permitted to tell of decedent's declarations and conduct, showing hostile attitude toward him, as reasons therefor were immaterial.

10. **Homicide—Statement of Deceased Held Admissible as Dying Declaration.**—Statement of deceased just before his death was properly admitted, where witness testified that decedent, before making statement, told witness that he was killed and knew he had to die, and never expressed any hope of recovery.

11. **Homicide—Statement Under Consciousness of Impending Death Not Rendered Incompetent by Subsequent Hope of Recovery.**—Statement made under consciousness of impending death is not rendered incompetent by subsequent expression of hope of recovery.

12. **Criminal Law—Objection to Dying Statement as Whole Not Proper Objection to Part.**—Objection to dying statement as whole did not constitute sufficient objection to part thereof.

13. **Homicide—Admission of Incompetent Part of Dying Statement Held Not Prejudicial.**—Admission of incompetent statement, in dying declaration that deceased, a peace officer, was searching for robbers when shot, could not have been prejudicial, where matter was testified to by defendant himself and many other witnesses, and there was no claim that defendant was connected with robbery.

14. **Homicide—One Attacked by Several May Base Claim of Self-Defense upon Reasonably Apprehended Danger from Either.**—Where several are acting in concert in attacking another, he may base his defense for injuring any one of them upon reasonably apprehended danger from others.

15. **Homicide—Evidence Held Not to Warrant Instruction upon Concentrated Attack by Decedent and Another.**—Evidence held not

to show any concerted attack by deceased and another upon defendant, so he was not entitled to an instruction concerning self-defense, in case of concerted attack.

CHAS. B. SPICER for appellant.

FRANK E. DAUGHERTY, Attorney General, and JOHN D. CARROLL for appellee.

OPINION OF THE COURT BY JUDGE CLARKE—Affirming.

Appellant was convicted of murder, and the death sentence imposed. For reversal it is urged that the court erred (1) in failing to grant a change of venue, (2) in denying a continuance, (3) in admitting incompetent evidence, and (4) in instructing the jury.

The killing occurred at about 11 p. m. on March 31, 1924, and on the next day appellant was arrested, indicted, brought into court and his case set for trial on April 4th. At that time he had not employed counsel to defend him, but when asked if he was able to do so said he was, and subpoenas were issued for his witnesses and placed in the hands of the sheriff. Upon the next day, April 2d, he was again brought into court, and announced that he was unable to employ counsel, and asked the court to appoint W. A. Brock, a local attorney, to defend him, which was done, and Brock accepted the appointment. On April 3d, C. B. Spicer and F. F. Acree were employed by friends of the defendant to defend him, which fact was made known to the court on the morning of April 4th, when the case was called for trial, and Brock was then permitted to retire from the case, which he did. Thereupon, defendant's employed counsel moved for a change of venue, and when that motion had been overruled, they asked that the trial of the case be postponed until some day in the following week, which motion was also overruled, and it is earnestly insisted that in each instance the court committed reversible error.

In support of the motion for a change of venue, defendant filed affidavits of himself and two supporting witnesses, as is required by law. In these affidavits it is asserted that the decedent was a popular and influential man, and widely related by blood or marriage to many prominent citizens of the county, that the newspapers of the county had published articles and friends of the decedent had circulated reports representing that defendant had assassinated decedent, that as a result thereof public

sentiment was extremely antagonistic to the defendant; that friends and kinsmen of the deceased had made threats of lynching the defendant and that they would shoot him in the court room if a verdict should be returned that did not meet their approval; that witnesses for the defendant were afraid to testify in the Harlan circuit court, and that in the opinion of the affiants he could not be afforded a fair and impartial trial in the county.

In opposition to the application, the Commonwealth attorney and the county attorney filed a response supported by the affidavits of five seemingly impartial witnesses, setting out the fact that the killing occurred at Lynch, which is located about thirty miles from the county seat and in a remote corner of the county, and alleging that although the decedent had many relatives and was widely known throughout the county, a large part of the citizenship was not affected thereby, and that the public mind was not greatly or unusually embittered against the defendant, or to such an extent as to prevent the selection of a fair and impartial jury from the citizens of the county, or to interfere with a fair and impartial trial of the case. Each of these witnesses expressed the opinion that the state of public feeling was not such as to impede or prevent a fair and impartial trial in the county by a jury selected from citizens thereof.

None of these witnesses, however, denied the averments of defendant's affidavit that friends and relatives of the decedent had threatened to lynch the defendant, or shoot him in the court room if a verdict was returned that did not meet their approval, or that defendant's witnesses were afraid to testify in Harlan county.

These allegations, however, are denied in the response filed by the attorneys for the prosecution, but same is not sworn to. Because of these facts, it is insisted for the defendant that these avermenst stand undenied, and must be accepted as true. To this, however, we are unable to accede. In the first place it is not alleged in defendant's affidavit that any particular relative or friend of decendent made any threat, and it was therefore impossible for the Commonwealth to meet this general charge, nor were the names given of defendant's witnesses who were afraid to testify for him, and that his apprehension in this latter respect was unfounded is clearly established by the fact that every one of the witnesses subpoenaed and called for the defense appeared and testified.

The averment that defendant was in danger from the friends and relatives of decedent is also rather conclusively controverted by the fact that a brother-in-law of the decedent brought defendant safely back from the place of his arrest in Virginia to the jail in Harlan county, and without improper treatment of any kind.

We are therefore of the opinion that the court did not abuse a sound discretion in refusing the application for a change of venue.

We are, however, of the opinion that the court erred in refusing to postpone the trial as requested until a day of the next week of this same term of court, in view of the recent employment of counsel for the defendant, and that for this error a reversal would have to be ordered if it were not for the fact, clearly established by the record, that the defendant was in nowise prejudiced thereby.

The sole ground for the request was that counsel had been employed only the evening before the day upon which the case was called for trial, and had not therefore had an opportunity to consult with their client or his witnesses, or otherwise properly prepare for the trial of so serious a charge. They, however, were afforded this opportunity, and for practically the length of time they requested the trial to be postponed for the purpose, by the fact the regular panel of the jury was soon exhausted, and the court was required twice to draw from the jury wheel new names and await their being brought into court, with the result that the actual trial of the case did not begin until the Tuesday following the Friday the case was set for trial and the effort to secure the jury begun. This gave the attorneys for the defendant from Thursday until Tuesday to prepare for the trial, the attendance of every witness they desired was secured, and the record attests the fact that the defense was ably and strongly presented.

We are therefore clearly of the opinion that although the court erred in denying to the attorneys for the defendant their request for a postponement for a few days to enable them properly to prepare themselves and the case for trial, the defendant was in nowise prejudiced thereby.

Before taking up the several alleged errors in the admission of evidence, it will be necessary to state as briefly as we can the substance of the evidence:

Lynch, although a good sized mining camp, is unincorporated. The decedent, J. V. Gross, a constable,

and his brother, Allie Gross, a deputy sheriff, were the peace officers for the community. Nearly an hour before the killing, they were driving in an automobile to a part of the camp to investigate a report about some disturbance, when they met defendant. They stopped and asked him what was going on, and he told them that there had been a holdup at the home of Fred Carter. J. V. Gross searched the defendant and told him to leave town. J. V. and Allie Gross then went to the home of Carter, where they were told by Carter's wife, who goes by the name of Chaney George, that one Ernest Huff and two others were implicated in the robbery at her home. The officers then started looking for Ernest Huff, and Chaney George accompanied them for the purpose of identifying him. They drove back along the same road, and just after the machine rounded a sharp curve and was in front of the home of Dominic Chance, Chaney George said, "There is Mr. Ernest now," J. V. Gross, who was driving the car, immediately stopped it, and Allie Gross jumped out on the right-hand side next to the Chance home and intercepted Huff as he approached, or attempted to run around the rear of the car. J. V. Gross in the meantime got out on the left side of the car and walked around in front of it, when, according to the evidence for the Commonwealth, he was shot twice by the defendant, who was standing on the eighth or ninth step leading from the sidewalk up to the house of Dominic Chance, and following these two shots, decedent and his brother Allie fired at about the same time at Griffn, who then started to run. Allie Gross pursued Griffiin for a short distance, but losing sight of him returned to his brother, who had fallen near the front of the car.

The defendant alone testified that he did not shoot until after two shots had been fired at him. Ernest Huff's testimony corroborates that of the Grosses to the extent that the first shot was fired before either of them shot, while Chaney George would not say who fired the first shot. These two witnesses were introduced by the defendant.

The relative position of the parties and the undisputed fact that decedent was shot first in the left arm and then in the breast, not only establishes the truth of the testimony of the two Grosses, but also proves the falsity of that of the defendant as to who shot first, without being contradicted by the testimony of Huff and Chaney George, or by any witness except the defendant.

Defendant immediately fled across the line into Virginia, where he was arrested while attempting to make good his escape. It was therefore established beyond the possibility of any reasonable doubt that the defendant, when he saw the Grosses returning from Carter's house, ran up the steps leading into Chance's home and from that vantage point fired the first shot into decedent's body when the decedent was neither aware of his presence nor looking in his direction.

It was in attempting to establish a motive for his action that the Commonwealth proved, over defendant's objection, by the testimony of Allie Gross and the dying declaration of J. V. Gross, just what occurred and was said by the parties when defendant was accosted by the Grosses about 45 minutes before the shooting, and told them of the holdup at Fred Carter's home. Both J. V. and Allie Gross stated that upon that occasion the former searched defendant and said to him, in words of Allie Gross:

"Fat-head, you are always up here in the camps. I have tried to get you to leave here. You are an undesirable citizen, and I want you to leave. Catch the train that leaves out of here in the morning. I have got several gambling games against you."

Even if this had been error, and we feel sure it was not, it could not possibly have been prejudicial because the defendant not only stated that this was the substance of what decedent then said to him, but also testified that upon the same occasion both the decedent and Allie Gross cursed and abused and beat him, and in addition testified that upon several previous occasions decedent had said the same thing to him, in substance, and treated him in practically the same way.

It also is insisted that the court erred in refusing to permit the defendant to prove that it was not customary for the decedent, as an officer, to run men out of town who violated the law, but that ordinarily he arrested them. We think this rejected evidence was immaterial, and therefore incompetent. If competent, however, it was admissible only for the purpose of showing that decedent entertained a hostile feeling toward defendant, which was proved practically without contradiction not only by defendant but by three other witnesses.

Objection was also made to the ruling of the court in refusing to permit the defendant to testify that de-

cedent, some time previous to the killing, tried to get him to make a false charge against two unnamed persons. Defendant was permitted to tell that upon that and other occasions decedent had mistreated him, warned him to leave town, and threatened to kill him if he ever came back. In other words, he was permitted to tell of decedent's declarations and conduct showing a hostile attitude toward him upon several occasions, but refused permission to give the reasons therefor.

These previous difficulties are in no sense a part of the *res gestae,* and were admissible only in so far as they exhibited decedent's feeling toward the defendant. As to whether or not that feeling was justified was wholly immaterial and could have no bearing whatever in this case, and we think the court was correct in limiting the defendant to proof of hostile declarations and conduct and refusing to permit an investigation of the reasons therefor.

It also is insisted that the court erred in admitting the dying declaration of J. V. Gross, both as related by Allie Gross and as stated by Park Taylor.

The former testified that decedent, before making the statement, told the witness that he was killed and knew he had to die—as he did within a very short time thereafter—and that he never expressed any hope of recovery. Every authority cited for defendant with reference to the admissibility of dying declarations proves the admissibility of the declaration as recited by Allie Gross. The Commonwealth assumed the burden and proved that he, decedent, at the time he made it, "was possessed with a consciousness of impending death," and this, according to the authorities cited, rendered the declaration competent.

Another contention is, that Taylor's proof of substantially the same declaration by decedent at another time was incompetent because of the fact that this witness said that the next day after making the statement the decedent expressed a hope that he might get well. But the authorities are clear and unanimous that a statement made under consciousness of impending death is not rendered incompetent by subsequent expression of a hope of recovery. Allen v. Commonwealth, 168 Ky. 325, 182 S. W. 176; Jackson v. Commonwealth, 189 Ky. 68, 224 S. W. 649; 21 Cyc. 978.

It is next insisted that so much of the statement as tells about the robbery and deceased's being out as an officer trying to find the guilty party, was incompetent.

In the first place, the objection was to the declaration as a whole, and not to this part of it. Then again, it was but a recital of what was proven by a number of other witnesses without objection. The defendant himself testified to the same thing, and there was no claim by anyone that the defendant was in any way connected with the robbery, and the fact that this circumstance was recited by decedent could not in any way prejudice the defendant.

The record is exceptionally free from possible errors in the admission and rejection of evidence, and certainly there is none that could have been prejudicial to the defendant.

The final contention is that the court erred in the instruction upon self-defense, in that no reference is made therein to Allie Gross.

It is thoroughly established that where several are acting in concert in attacking another, he may base his defense for injuring any one of them upon reasonably apprehended danger from the others, and if there had been any evidence that defendant shot decedent from a reasonable apprehension of death or great bodily harm about to be inflicted upon him by Allie as well as J. V. Gross, the self-defense instruction in this case would have been erroneous, but such is not the case.

There is no evidence whatever of a concerted attack by the two Grosses, nor any evidence of self-defense from an attack by either, except defendant's own testimony, and there is no intimation by him that when he shot he apprehended danger from anyone except decedent, or that Allie Gross was at the time doing anything at all to him.

It is true that defendant, upon cross-examination, when asked why he fired two shots and no more, responded, "They were firing at me, and I thought that would protect me," but throughout the whole of his testimony he makes it clear that he shot J. V. Gross only because the latter commanded him to halt and then shot at him twice. Over and again he said in substance what he thus stated near the end of his cross-examination:

"When he tried to stop me I run up those steps, and when he fired I fell on my hands, just this way, and he fired those shots first, and I fired back and run."

There is therefore absolutely no basis whatever, and none is relied upon for support of this contention, except the fact the defendant one time said "they" when his every other statement shows clearly he meant only J. V. Gross. There is no other evidence in the entire record indicating even remotely that Allie Gross fired at defendant, or even saw him until after he had shot at and mortally wounded decedent, and it would be simply preposterous to reverse this case because of the failure to accord the defendant a right to defend against an attack from Allie Gross, a right he himself did not claim in his own testimony.

Convinced that the appellant has had a fair and impartial trial, free from any prejudicial error, the judgment is affirmed.

· The whole court sitting.