## Elijah Calico and Adolph Beasley v. Commonwealth.

(Decided December 19, 1924.)

## Appeal from Jessamine Circuit Court.

1.  Criminal Law—Change of Venue Properly Denied Under Evidence.
    —Though on defendants' arrest for homicide the county judge, fearing violence, had them sent by night to jail in another county, change of venue was properly denied under evidence showing clearly that no reason existed why they should not have fair trial.
2.  Criminal Law—Continuance for Preparation Held Properly Denied.
    —Defendants accused of homicide held properly refused continuance, and case set over to the following Monday, where their examining trial had been held some two weeks before and they had been in the town where they and their attorneys resided since that time.
3.  Homicide—Dying Declaration Admissible Notwithstanding Deceased's Subsequently Expressed Hope of Recovery.—Dying declarations accusing defendants held properly admitted under evidence showing that deceased was informed and believed that he could not recover, notwithstanding his subsequently expressed hope of recovery.
4.  Homicide—Whether Defendant was Fully Conscious when Making Dying Declaration Held for Jury.—Whether, in view of decedent's physical infirmity, he was fully conscious when he made dying declaration held question for jury under the evidence.

JNO. S. DEERING and J. G. BEGLEY for appellants.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

Opinion of the Court by Commissioner Hobson—Affirming.

Elijah Calico and Adolph Beasley were indicted in the Jessamine circuit court for the murder of Frank Carter. On a trial of the case they were found guilty and their punishment fixed at imprisonment for life. They appeal.

On Monday evening, January 21, 1924, Carter, who was a farmer living a few miles in the country, was in Nicholasville with his car, a Buick. Twice on that evening he pulled a large roll of money out of his pocket. A bystander said to him that he ought to put his money in a safe, but he said he could take care of his money and put it back in his pocket. As he passed along the street Beasley remarked to a witness: "There goes a fellow who always has a heavy roll on him." He and Beasley and Calico were for some time between seven and eight o'clock in a pool room and during this time Carter took out the money in the presence of Calico. The witness estimated the roll of bills to be $150.00. About eight o'clock Carter and the appellants came in his car to a garage for the purpose of having the lights fixed. It had a red body with yellow wheels. The three men left the garage about eight-thirty together. About nine o'clock a Buick car with a red body was seen going along the Sugar creek pike about eight miles from Nicholasville at a country store known as Teator's. A witness, who resided about ten miles from this store, testified that about midnight he heard a car coming up the pike past his house going toward Logan lane and heard it suddenly stop near the lane. He also testified that before this he heard another car stop about the same place. The next morning Carter's car was found uninjured in the lane about 180 yards from the pike, where it would be out of sight from the pike. There was blood on the hind seat, blood on the floor; a bloody cap, pieces of a broken bottle and bloody gloves were found in the car and a cloth from which the blood had apparently been wrung out. Back of the car on the lane there were some signs of a struggle. There were two pools of blood as though the wounded man had fallen down and after bleeding a while had gone on and fallen again. It was a very cold night; the thermometer was about zero. The next morning Carter was found about half a mile from his car in a branch in a corn

field.   He was lying down in the branch; his face and head were in a solid sheet of blood; he had some wounds on one side of his head; his head was mashed in on the other and one of his hands was frozen.   The men who found him also found blood on the ground, indicating the course he had come before he reached the branch.   Some yards from where he was found, about two weeks later, the owner found in a corn shock a five gallon can about half full of whiskey.   The can had blood on it.   Carter was taken to the house of the farmer who found him.   A doctor was sent for.   The doctor took him to an infirmary in Lexington and on the next day he was operated on. The doctor opened his scalp and found a hole in his skull, possibly three inches across, practically a circle.   The bones were driven down until they pressed the brain and the corners where the three big bones came down penetrated the brain.   When he lifted these out he found several rents in the covering of the brain and in several septums in the brain.   He had one cut possibly two and a half inches long on the back of his head and a number of other smaller cuts scattered over his head.   He died on Thursday, January 31st.

The defendants both testified that they did not know anything about his having any money; that they had always been good friends of Carter; that after leaving the pool room Carter got in his car and couldn't make it go and called to them to come and help him start it; that they had great difficulty in starting it, and at his request stayed with him until he got to the garage with it; that after it was fixed at the garage they rode back with him to the pool room, where they got out and he went away and they saw him no more; that after going to a dance they went home. They also testify that Carter was drinking or drunk and was proposing to go after some whiskey.   Beasley testified that Carter wanted to borrow his car for the purpose, but he did not lend it to him.

The defendants filed an application for a change of venue.   The court overruled the motion and of this they complained.   The evidence heard before the circuit court on the motion has been brought up.   While it appears that at the time the defendants where arrested the county judge, fearing violence to them, had them sent by night to the jail of another county, there is no evidence that any violence was ever contemplated in fact.   They were

returned to the county on February 21st; had an examining trial and remained in the county until the case was tried in the circuit court without any manifestation of trouble. The great weight of the evidence shows clearly that no reason existed why they could not have a fair trial in that county. The circuit court properly refused the motion.

The defendants also filed an affidavit for a continuance on the ground that they had not had time to prepare their defense. The court refused to continue the case but set it over to the following Monday and it was then tried. This was proper. They had had an examining trial about two weeks before and had been in Nicholasville where the attorneys resided since that time. They both lived in Nicholasville and no reason is shown for a continuance of the case under the circumstances.

On the trial of the case the court admitted in evidence the dying declaration of the deceased. It is earnestly insisted that this was improper. The deceased was taken to the infirmary on Tuesday; on Wednesday he was operated on and on Friday he made the declaration in question. Before he made it the nurse, Mrs. Downey, explained to him the seriousness of his illness; that his skull had been fractured; that he was considered in a very grave condition and the doctor did not think he would get well. After she had made this statement to him he was asked if he thought he would get well and he answered: "I don't think I can." After he said this he was asked to tell how he was hurt and he said that Adolph Beasley and Elijah Calico were with him at the time he was hurt; that he was hit in the head with a bottle and that he bled like killing hogs. He said, "I think Adolph hit me."

The evidence also shows that two or three days after this on other occasions he twice expressed hope of getting well and it is earnestly insisted that he had not abandoned hope of recovery when he made the statement referred to. In Griffin v. Commonwealth, 204 Ky. 790, this court having under consideration a like case said:

"Another contention is, that Taylor's proof of substantially the same declaration by decedent at another time was incompetent because of the fact that this witness said that the next day after making the statement the decedent expressed a hope

that he might get well. But the authorities are clear and unanimous that a statement made under consciousness of impending death is not rendered incompetent by subsequent expression of a hope of recovery. Allen v. Commonwealth, 168 Ky. 325, 182 S. W. 176; Jackson v. Commonwealth, 188 Ky. 583, 224 S. W. 649; 21 Cyc. 978.''

There were a number of persons present when the above declaration was made on Friday and they all agree, practically, in what took place. In view of the admitted physical condition of the deceased the circuit court did not err in holding the testimony sufficient to show that he made the declaration when he had given up hope of life. There is evidence showing that he was not at himself much of the time while in the hospital, but the witnesses agree that he was fully conscious at the time he made the above statement. This, too, was a question for the jury. They heard all the evidence as to his condition and they could give such weight as they saw proper to his statement.

No other ground of reversal is seriously urged. The instructions of the court were proper and are not complained of. On the whole record the circuit court seems carefully to have protected all the rights of the defendants and we find no substantial error to their prejudice.

Judgment affirmed.