## Commonwealth v. Belcher.

(Decided Sept. 28, 1934.)

BAILEY P. WOOTTON, Attorney General, H. HAMILTON RICE, Assistant Attorney General, and J. E. CHILDERS for appellant.

E. J. PICKLESIMER for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Certifying the law.

Appellee was indicted, charged with the offense of murder. On his trial, he was convicted of the offense of manslaughter, and sentenced to serve two years in the penitentiary. His motion for a new trial was sustained on the ground that the court had erroneously admitted in evidence the dying declaration of Caudill Potter, the person whom the appellee was accused of killing. The commonwealth has appealed, asking that the law be certified as to whether this dying declaration should be admitted in evidence on the next trial or not.

The parties are not at disagreement as to the applicable law, for both sides concede that a dying declaration, to be admissible in evidence, must be made under

a sense of impending death and at a time when the deceased did not have any expectation or hope of recovery. Allen v. Commonwealth, 168 Ky. 325, 182 S. W. 176. The parties, however, sharply differ as to whether the facts of this case show that the declaration in question was made under a sense of impending death and at a time when the deceased did not have any expectation or hope of recovery. To dispose of this issue requires a somewhat full statement of the evidence bearing upon it.

Caudill Potter, the deceased, was shot by the appellee about noon on July 17, 1933. The shooting took place out in the country some distance away from Pikeville. The appellee at once conveyed the wounded man to Pikeville and took him to the Methodist Hospital. Caudill Potter remained there until the following morning, when he died. The dying declaration was made by Caudill Potter, according to the certificate of the notary public who swore the declarant to the statement, at 6:30 p. m. Just prior to the making of the statement, Mr. L. J. May, an attorney of the Pikeville bar and a representative of Potter's family, together with Mr. J. M. Hatcher, the official stenographer, and the Honorable Sidney Trivette, the county attorney of Pike county, came to the hospital for the purpose of procuring this statement. There is not the slightest doubt that up to this time Caudill Potter believed that his condition, while serious, was not dangerously so, and that he would recover. Indeed, when these gentlemen first went into the sick room, they were told by Caudill Potter that he thought he would pull through, and they realized the futility of taking any statement from him under such circumstances. It was apparent, however, to any disinterested observer that Potter was mortally wounded. They retired to the corridor of the hospital and got in contact with Dr. R. S. Johnson, the physician who was treating Caudill Potter. The physician told these gentlemen that Potter did not have a chance to live. On their suggestion, he went into Potter's room to so inform him. The physician testifies that, when he went in for this purpose, he asked Potter how he felt, and that Potter replied: "Very well," and that he thought that he would get well. The physician then said, to quote from his testimony: "I told him very frankly of the seriousness of his condition—I told him in all probability he wouldn't get well." The physician was then asked: "After you made that statement

to him, did he say anything further about his condition?'' to which the physician replied: ''He further made the statement that he was going to die; that he didn't think he would get well.'' The court then inquired whether Potter made this statement after the physician had told him of the seriousness of his condition, and the physician answered: ''Yes sir, it was after I told him.'' On cross-examination, the physician was asked whether Potter, after he had been told of the seriousness of his wound, ever held out any hopes of getting well, to which the physician replied that he could not say whether Potter did or not, and that he did not know whether at the time Potter made his dying declaration Potter had any hopes of getting well.

Mr. May told of how Mr. Potter said he felt that he would get well when he and Messrs. Hatcher and Trivette first went into the sick room, and of how they told Potter that there was no need to take his statement as long as he held out hope of living. Because it was obvious that Potter was mortally wounded, Mr. May said that his party went out into the corridor and had a conference with Dr. Johnson, in which Dr. Johnson corroborated their opinion as to Potter's condition. May further stated that they asked Dr. Johnson to go in and tell Potter just what his condition was, that they all went back into the sick room, and that, after Dr. Johnson had told Potter of his condition, Potter stated that he was ready to give a declaration. We now quote from Mr. May's testimony:

> ''He [Potter] first said: 'I don't believe I will get well.' He paused a minute and he said in some case the court held that wasn't good that way. I believe he said he was in court when they tried the case and he laid there a while longer like he was studying, and as I remember the way he stated it: 'I am going to die from these gun shot wounds;' and then made the rest of the statement.''

George Potter, a relative of the deceased, arrived at the hospital just after Mr. May and his party had commenced taking the dying declaration. After Caudill Potter had finished his statement, he turned to George Potter and, to quote from his testimony, said:

> ''He [Potter] says I want you to be good, and I have got to die and meet me in a better world.''

Ernest Potter, a brother of the deceased, testifies that he got to the hospital about 5 o'clock, and that when he went into the sick room Caudill Potter looked up at the witness and said: "Ain't this awful I have to die like this for nothing." He further testifies that, after Caudill Potter had made his dying declaration, he said to those present:

"I have to leave you * * * I want you to meet me in a better world."

Mr. Hatcher, the stenographer who took the dying declaration, testifies substantially to the same facts as did Mr. May.

For the defense, Mosco Belcher, a brother of the appellee, testifies that he went to see Caudill Potter at the hospital an hour or so after dark. He later places the time at about 10 o'clock in the evening. Caudill Potter had sent for him through a man named Van Good. Potter's purpose in sending for Belcher was, as Belcher testifies, to get Belcher to go to the county school superintendent's office next day and sign up for Caudill Potter, who was a school teacher, the latter's school teaching contract for the ensuing year. Belcher admits that at this hour he could see that Potter was dying. Mrs. Vala Belcher, the mother-in-law of Caudill Potter, testifies that just before Mr. May and his companions arrived and took the dying declaration Caudill Potter stated that he was going to get well. Nora Potter, the wife of Caudill Potter, and sister of the appellee, testified to the same effect. Van Good testifies that about 5 o'clock in the afternoon he was sent for by Caudill Potter, that, on responding to this call, Caudill Potter got him to go out into the country to get Mosco Belcher, and that he returned with Mosco Belcher after dark.

In rebuttal, the commonwealth produced Ernest Potter and George Potter, who testified that Caudill Potter did not ask Mosco Belcher in the interview which is admitted that Mosco Belcher had with Caudill Potter to go to the county school superintendent's office and sign up his school teacher's contract.

From this resume of the evidence, two things are clearly established: First, that Caudill Potter, up to the time Mr. May and his associates came to take his statement, believed that he would recover from his

wounds. The testimony of the members of the Belcher family to this effect is corroborated by the statements of the commonwealth's witnesses, Mr. May and Mr. Hatcher. It is further established that the doctor told Caudill Potter that he would not recover from his wounds. The dying declaration made just after this information had been imparted to Caudill Potter by the physician states unequivocally that the declarant knew he was going to die. The members of the Potter family who were present add to this that, after Caudill Potter had made the dying declaration, he made other statements indicating his belief that he could not get well. Were this all there was in the case, there could be scarce doubt that the evidence establishes that the dying declaration was made at a time when the declarant did not have any expectation or hope of recovery, and when he was under a sense of impending death. There is, however, the complication of Mosco Belcher's testimony as to what took place about 10 o'clock that night when he came to the hospital. It must not be forgotten in discussing this testimony that Caudill Potter had sent for Mosco Belcher about 5 o'clock in the afternoon through his friend, Van Good. At this time, as hereinbefore set out, everybody concedes that Caudill Potter felt that he would get well. It was not until about an hour and a half after he had sent Van Good on his mission that Caudill Potter was informed by his physician that he could not get well, and that Caudill Potter then said that he was going to die. It is true the commonwealth introduced testimony to the effect that Mosco Belcher's testimony that Caudill Potter asked him to go to the county superintendent's office and have his contract signed did not take place. But, even if it did, that is not fatal to the commonwealth's contention that this dying declaration is admissible. The test whether a dying declaration is admissible is whether at the time it was made the declarant was then under a sense of impending death and when he did not have any expectation or hope of recovery. If so made, the fact that thereafter a hope of recovery is aroused in the breast of the declarant to which he gives expression, does not make the dying declaration incompetent. Calico et al. v. Commonwealth, 206 Ky. 271, 267 S. W. 167; Griffin v. Commonwealth, 204 Ky. 790, 265 S. W. 327; Allen v. Commonwealth, 168 Ky. 325, 182 S. W. 176.

In Lyons v. Commonwealth, 216 Ky. 202, 287 S. W. 534, 535, the rule is thus stated:

"The admissibility of a dying declaration is not affected by expressions of belief upon the part of deceased, made before the dying statement, or thereafter, to the effect that he expects to get well. The question always is what was the state of his mind at the time he makes the statement, for if he then believes he is facing impending death the theory of the law is that his statement is competent because in such a state of mind there is removed all incentive to tell anything less than the whole truth about the transaction. The fact that he has ·theretofore since his injury, or may thereafter, be of opinion that he is going to get well, does not change or affect his state of mind if he at the time of making the statement believed death was impending."

The evidence is overwhelming that at the time Caudill Potter made his dying declaration he publicly expressed his belief that he was going to die. He did this just after being informed by his physician of his condition. We are of the opinion that Caudill Potter at the time he made his dying declaration was sincere in this expressed belief of impending dissolution, and honestly thought that he had no· hope of recovery. It may be that three hours later, when a man for whom he had sent hours before he had been informed of his condition by the doctor came in response to his call, a flicker of hope was aroused in his breast. But, even if so, that does not contradict the fact that at the time he made his dying declaration he had given up all hope of living. We are constrained to the belief that the dying declaration was made at the time the declarant was under a sense of impending death and when he did not have any expectation or hope of recovery. It was admissible in evidence. The law is so certified.