### Belcher v. Commonwealth.
(Decided Jan. 31, 1936.)

E. J. PICKLESIMER for appellant.

B. M. VINCENT, Attorney General, and A. E. FUNK, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

At the October term, 1933, of the Pike circuit court, the appellant was indicted, charged with the offense of murder. Upon trial, he was convicted of manslaughter and sentenced to serve two years in the penitentiary. From that judgment this appeal is prosecuted, seeking its reversal.

The grounds here relied on by appellant for a new trial are not clearly presented in conformity with the directions of rule 5 of this court, requiring that they be in a concise, separate statement, with the authorities relied upon subjoined; but nonetheless the gravamen and essence of the argument urged in brief of counsel for reversal is that appellant is entitled thereto because, he insists, the verdict is flagrantly against the evidence.

This is the third trial of this case. The first resulted in a mistrial from the jury's being unable to agree upon a verdict. Upon a retrial, appellant was convicted of manslaughter and sentenced to two years' imprisonment in the penitentiary.

Appellant's motion and grounds for a new trial was sustained upon the sole ground that the court had erred in admitting in evidence the dying statement of the deceased, Caudill Potter. From this ruling, the commonwealth appeals, asking that the law be certified as to whether the dying declaration of Potter should be admitted in evidence on the next trial. This court held that the dying declaration was properly admissible as such in evidence and the law so certified. Commonwealth v. Belcher, 255 Ky. 475, 74 S. W. (2d) 955.

Upon this, the third trial, appellant was, as stated supra, again convicted of manslaughter and sentenced to two years' imprisonment in the penitentiary.

Inasmuch as appellant is seeking a new trial upon the ground that the verdict is against the evidence, for a proper consideration and decision of this question, we deem it necessary to give a brief analysis of the evidence.

It is disclosed by the record that the appellant,

Harvey Belcher, and the deceased, Caudill Potter, were brothers-in-law, Potter having married appellant's sister. These two men and their families, who lived some twelve or fifteen miles apart in Pike county, were shown by the record to have been on friendly and intimate terms with each other for years. Further it appears that on the Sunday some eight days before the shooting occurred, the deceased Potter, his wife, and three year old son spent the day with the appellant and his family, and that while later returning to their home, a disagreement arose between Potter and his wife. She testifies that he then badly "beat her up," and ordered her to get out of the car, when he proceeded with their little son on his way home, leaving her to walk back to the home of her brother, the appellant. Some time later in the week, she prevailed upon her brother, the appellant, to go with her to her husband's home and help her to regain the custody of her small son, which he agreed to do upon the condition that "he should do the talking" with the brother-in-law, as the relations were not strained between them. They accordingly went to see Potter, when the deceased, after he and the appellant had discussed the matter of the child's return to his mother, agreed that his wife might take the little boy back with her.

Upon the following Monday morning the deceased drove to the home of Mosco Belcher, nearby that of appellant, where he was seen by the appellant, as he too had gone to his brother's home to borrow some needed article. The appellant when passing spoke to Potter and invited him to come by on his way back and have dinner with him and his family, to which Potter agreed.

Appellant states that he reported, upon his return home, that Potter would soon be by and would stop and have dinner with them.

About noon Potter drove up and stopped in front of appellant's home, when, without leaving the car, he called his little son from the house, who at once came to him, followed by appellant's wife, who, it is testified, after speaking to Potter and inviting him in, took up the child in her arms and was starting to the house when it appears the deceased took offense at her action in taking the child from the car, and commenced

to curse, stating that the little boy was "none of her damned affair." At this juncture, the appellant came out of his store, only a short distance from his home, with some candy, which the deceased had called to the appellant to bring to him for the boy, when deceased turned his attention to him, declaring (the appelant testifies) that he would kill the "whole g. d. family" over the boy.

Appellant states that the deceased came around the front of his car standing some ten or fifteen feet away, angered and advancing upon him with one hand in his pocket, as if about to draw his pistol; that seeing this, he "called on him to stop," notwithstanding which the deceased continued threateningly to advance on him, when appellant backed a step or two to his store door, where he reached in and got his pistol off the counter and fired three shots, two of which struck Potter with fatal effect.

It further appears that quickly following the shooting, the witness Adams, the appellant, his wife, and two others standing nearby, who had been attracted by the shots, lifted the deceased into the car and hurried him to the hospital at Pikeville for treatment, where, after making a dying declaration that evening, he died the following morning as a result of the shooting.

The appellant attempted to show by his evidence that the deceased was armed and threatening him at the time he approached him at his store door, but in this it appears that he is entirely uncorroborated. The witness Van Good first stated that the deceased was armed and that he removed a pistol from his pocket when he searched him after he was shot, but later changed his testimony, saying that his first statement was untrue, as he neither found nor took any pistol from off the deceased upon this occasion.

The evidence for the commonwealth, on the other hand, consists practically of that given by the dying declaration, made by the deceased at the hospital on the evening next before his death, after being advised by his attending physician that he was fatally injured and would not get well.

Appellant criticizes both the weight and admissibility in evidence of this statement given by the decedent, but inasmuch as this question was otherwise

determined and the law so certified upon a former appeal, we find it unnecessary to discuss this point.

Inasmuch as no eyewitness testified as to the facts and circumstances of this killing, with the exception of the participants, it results that practically the only evidence for the commonwealth is found in this dying statement of the decedent, by which he is to be considered as testifying as follows:

"I, Caudill Potter, state that I am going to die from these gun shot wounds. On today I come up to Harvey Belchers, my brother-in-law and didn't have any arms of any kind, not even a pocket knife. I tried to get my wife to go back in a friendly manner after I got up there, and I called Paul Randall, my little boy, out to the car, and bought him a dime's worth of candy in Harvey's store. I got the baby in the car and Harvey's wife got the baby in her arms and started to take him back to the house and Harvey just up and shot me with a pistol. I never tried to fight him at all and never made any threat of any kind. I wasn't expecting him to shoot me. I was in the road when I was shot and he come out to the car when he shot me he was about ten or fifteen feet from me when he shot me. I didn't do or say anything to Harvey's wife when she took the baby and didn't have any weapon of any kind."

As contradictory of this statement of the deceased, that he never tried to fight Harvey at all and never made any threat of any kind, is the testimony of appellant, to the effect that the deceased was advancing upon him in a threatening manner and that he shot Potter because he thought deceased was then about to shoot him.

It is not our problem to weigh the relative weight and credibility of these conflicting statements, as in such case the determination of this issue is for the jury. It, we may presume, is acquainted with the relative trustworthiness and truthfulness of both the deceased and appellant and his witnesses. It being so thereby advised and assisted in its interpretation and evaluation of the evidence and determination of the issues presented by this conflicting evidence as to who of the two was the aggressor and whether or not appellant

shot and killed deceased in his self-defense, we feel unauthorized to set aside or disturb its verdict, based upon the evidence thus heard, as being flagrantly against the evidence, even though its verdict finding appellant guilty was supported only by the statements of deceased's dying declaration given in evidence. The jury was authorized to accept the statements of the dying declaration as the true version of the tragedy, and therefore such being its finding, we are constrained to conclude that its verdict based thereon is not flagrantly against the evidence, from which it follows that the trial court's judgment thereon should be, and it is, affirmed.