## Bailey v. Commonwealth.

Dec. 12, 1941.

614

R. Hall Hood and Roy G. Garrison for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellant and Toy Lenning were charged with the murder of Claud Brown. Following severance Bailey was put on trial, resulting in a verdict and consequent judgment of nine years' confinement in the penitentiary. Numerous grounds for new trial were set up, but on appeal narrowed to four: (1) The court erred in overruling appellant's motion for a directed verdict; (2) incompetent and prejudicial evidence was admitted over appellant's objection. (3) The court did not instruct the jury on the whole law of the case; lastly the verdict was contrary to the evidence.

At the outset we may say that as we read the proof, appellant was not entitled to a directed verdict; there was sufficient proof to take the case to the jury. Since we have concluded that grounds (2) and (3) are meritorious we shall not dicuss ground (4) to any extent. Appellant was a traveling salesman; deceased Brown operated a restaurant, and also gambling rooms in another part of Murray. Lenning was a jack of several trades, and at times assisted Brown in his gambling place. Brown was given to excessive drinking; Bailey drank, but Lenning did not. Bailey's mother owned the building in which Brown operated his games; the son looked after the property, and was a frequent visitor at Brown's rooms; all three were good friends.

The grand jury, during the week preceding August 12, 1940, was investigating the gambling situation in Murray, and subpoenæ for the 12th had been served on Brown on the 10th of August. Bailey testified that on

the night of the 11th he was at home and received a message that Brown wanted to talk to him. His request was to pick him up at a designated place. Bailey drove there but did not find Brown. He drove to another restaurant, left his car, went in and upon coming out found Brown standing near his car. Brown wanted to talk to Bailey, and suggested that he needed a "little air"; that he had "something on his mind and could not sleep." Brown was drinking, and had a half pint of whisky. He suggested they drive to Paducah, and they started in that direction but stopped at a roadhouse, where they took a few drinks and had a bite to eat. While there, and without showing why it happened, they had some difficulty, which all parties seem to have treated as only rough play. Brown had a pistol which the proprietor took from him.

They left the roadhouse and drove to Paducah, where they obtained two pints of whisky, and started back to Murray. They stopped again at the roadhouse, and over protests of the proprietor remained until 3 o'clock; the proprietor returned Brown's pistol on assurance that there would be no trouble. They drove to Benton; Brown wanted to go across to Illinois to see a girl, Bailey protesting all the time, saying he wanted to get home and get some sleep, and refused to go across the river. They had breakfast at Benton, and started back to Murray, arriving about 6:30 a. m. Bailey then insisted on taking Brown to his room, and apparently started in that direction. Brown protested, grabbing the wheel and insisting on going in another direction, as Bailey thought, to his restaurant. They drove on until they got to the home of Lenning, where they stopped. Lenning dressed and came out. Brown still wanted to ride; Bailey, realized that he was in no condition to drive, and upon his suggestion Lenning got in and took the wheel. Brown suggested that they drive to Green Plane Cemetery, and they did.

It seems that Brown had theretofore been convicted of manslaughter, and the man he had killed was buried there. It is said that Brown had what may be called an "alcoholic complex"; whenever he became intoxicated he wanted to drive to the cemetery, a frequent occurrence. On this occasion he had Lenning to stop in the gateway where he and Bailey took a drink.

The party started back to Murray; on the way

Brown wanted to answer a call of nature, and Lenning stopped the car near Clark's River bridge. Bailey alighted first; Lenning did not get out. The car was a new model, made without running boards. In attempting to alight Brown missed his footing and fell from the car on the side of the road. Bailey helped him up, brushed his clothing off, and the two went down the bank under the bridge and returned to the car. Brown wanted to sit on the outside, but finally agreed to get in. This disagreement resulted in Bailey slapping Brown. Bailey and Lenning testify that neither the fall to the ground, nor the slapping by Bailey drew blood.

When they returned to Murray, Bailey told Lenning to take him home, and then take Brown to his rooms. He drove to Bailey's home; Bailey got out and went in the house, directing Lenning to take care of Brown. Bailey went in and had started to shave when he heard his wife call "Claud Brown is coming in the house." He went to the door and saw Brown, with a pistol in his hand, shove the door open and push his wife so that she fell to the floor and fainted. Brown insisted on coming into the house, and started into a room where Bailey's mother was in bed. Bailey ordered Brown out, and undertook to reach his pistol, but Brown put it behind him; Bailey then struck Brown a severe blow in the face, knocking him to the floor. Bailey picked him up, took him to the bathroom and got a towel, and told him to wash up, and that Lenning, who had come into the house, would take him home. Bailey went on about his shaving, but heard Brown fall in the bathroom. Brown had concluded to take a bath; Bailey insisted that he should not. Bailey then left the bathroom and Brown fell again, and Bailey and Lenning washed him up, got him some clean underwear and dressed him. Both say Brown's fall, and the blow, had caused profuse bleeding and some bruises. The foregoing as to what occurred in the house, related by Bailey, is corroborated by Lenning, the brother, mother and wife of Bailey.

Bailey and Lenning took Brown in Bailey's car to the hospital. Dr. Garrett took charge of Brown, who was unconscious, and so remained for the entire day. Dr. Garrett described the wounds he found on Brown's body, chiefly about the head in front. Pictures showed several fractures, which Dr. Garrett thought were minor. After his death the physician declined to sign

a death certificate, because he thought it was a case for the coroner, and he was uncertain as to the cause of death, as was Dr. Mason, who said it might have been from cerebral hemmorhage or from failure of the large artery to function. While they thought the abrasions and fractures might have been the result of a blow with some blunt instrument, or from falls against a bath tub or lavatory, they did not think a blow with a fist would have produced the physical results.

As bearing on the question of Brown's appearance when the parties got back to Murray, several persons testify that they did not see any blood on Brown's face. It is also shown that on August 23, Brown absented himself from the hospital without leave, and was seen about town. He called Bailey and wanted to talk to him. The two got in the car and repeated the trip they had made on the night of the 11th, and were seen in Benton by a man who expressed surprise at seeing them together; it was explained to him that they were friends.

On this trip Brown, according to Bailey, attempted to tell him that he had not said or meant to say to others how the injury occurred. That on this trip they obtained and drank whisky can hardly be questioned, since Dr. Garrett said Brown returned to the hospital during the night, but was refused admittance because he was drunk. He returned later and Dr. Garrett concluded it was best to take him in. Brown died on the following day. The doctors thought that the use of alcohol might have contributed to or hastened his death.

The commonwealth, after showing that Brown had been subpoenæd to the grand jury, proved that Brown and Bailey had been seen together in Bailey's car at various times and places that night, and the next morning at the cemetery, and more particularly at the place where the commonwealth centered the assault, near Clark's River bridge.

Two witnesses, man and wife, driving past the spot saw a coupe parked on the side of the road near the bridge. They thought Brown was under the car, "and it looked like Bailey was slapping him on the head." The wife saying "with his open hand." Two other persons passed the point, riding a tractor. They seem to have known Brown and Bailey. They say in substance that "one fellow was under the wheel." Bailey was on

the ground, "the other fellow was in the car," his feet on the running board. After they passed they saw Bailey and Brown walk down the "dump" toward the river bank.

Dewey Willis was "hitch-hiking" from Hazel, riding northwardly with some man he did not know, at 35 to 40 miles per hour. He saw the coupe—Bailey, Brown and Lenning were all on the ground. "Lenning was holding Brown, and the other fellow hit Brown once with something that looked like a pistol and Brown fell to the ground." On cross-examination he said that he did not know Bailey or Lenning prior to that day, though he had heard they were "buddies."

It was shown that Brown, when disrobed at the hospital, had on underwear bearing Bailey's laundry mark. Two or three witnesses (laundrymen) were brought forward to identify the mark. Bailey testified that he had put some of his underwear on Brown before he was taken to the hospital. His wife had washed Brown's linen, but it had not been returned to him for reasons explained by Bailey.

We take up now the question of admission over objection of incompetent testimony. The commonwealth introduced Buford Brown, a brother of deceased. He testified that on the morning of the 13th, he had learned that Claud had been taken to the hospital. He went there and found him unconscious. On the following morning he went back and Claud "seemed to be conscious." Asked if Claud made any statements as to his condition, he answered in substance:

> "He said the licks he got on his head yesterday morning are killing me. He realized and knew full well that he was going to die, and that he would die soon; that he would like to see John King and make a statement to him as to who did it and for what purpose it was done."

He said Claud did not at that time make a further statement.

The brother carried the message to the commonwealth's attorney, but did not tell the attorney what Claud had said about his condition. The brother returned with the attorney, the county judge and the court reporter. These officers went into Brown's room, and

the judge administered the oath to Brown; the commonwealth's officer began to question him, leading up to a statement as to what occurred on the morning of the 12th. Brown, in substance, said that they got in a car and went down below the railroad. They drove back to a store. Brown wanted to get out and go home. Bailey said, "No, let's have a good time; let's get some liquor."

"I said, I don't know whether I want any or not. We did get a half pint. * * * When we got back to town he said, 'What do you think about tomorrow?' I said 'I don't know, I have laid here two nights and studied about what's going to happen.' He said 'I'll go in here and get $50 and you can have half of it and we will shoot some dice.' We did not drink any more whisky until yesterday morning. I told Rhodes to let me have his pistol. I felt like something was going to happen. He said 'You will kill him.' I said 'I don't want to do that, I want a little protection.' We came back to town; drove out on the west side and were going down towards Ernest's (Bailey's brother), and he pulled out a big pistol and hit me up here two or three times, and put me out of condition. I did not even have a pocket knife. We were as good friends as you and I."

He further stated in response to leading questions, that *they* had attempted to get him to promise that he would not appear before the grand jury, and *"he* offered me anything I wanted, and I told them I never did talk and I did not know what I would do. I had done nothing to cause him to hit me."

The testimony was taken in shorthand, and before transcription was made, read to Brown who signed his name to the notes. The testimony was later transcribed, and read to the jury by the commonwealth's attorney, over objection. He was then asked if the testimony read embraced everything said by Brown; he said it did not, and was permitted, over objection, to relate what was said by Brown aside from the contents of the transcription. We fail to find any difference in substance, but some elaboration.

So far it may be noted this statement was made without suggestion as to Brown's condition, or as to whether or not he expected to die. The attorney frankly

said, "at that time I had no idea Claud was going to die," hence did not "think it was necessary to include all the statements Brown had made." It is apparent from a jurat appended to the transcript that the proof was taken only for the purpose of procuring a warrant for Bailey in case Brown died, since the brother based the issuance of the warrant on his affidavit that Brown had died on the 24th of August "from wounds inflicted by Bailey, as set out in the affidavit of C. L. Brown made on August 13, 1940."

It is hardly necessary to cite authorities to show that this testimony was incompetent; and perhaps prejudicial since coming from an officer of the court whose recital would perhaps create a deeper impression on the minds of the jury. However, no matter who might have presented the testimony, it was incompetent for the reason that before such testimony is admissible it must be satisfactorily shown to the court that it was made in extremis. The cases in which we have held error in this respect are numerous. See Com. v. Belcher, 255 Ky. 475, 74 S. W. (2d) 955, and many cases cited in 10 Ky. Dig. under Homicide, Key Number System 203 and subdivisions.

While Buford Brown was first on the stand, and had undertaken to tell of the alleged declaration, when objection came, it having developed that a written statement had been taken, the court sustained objection, and said: "I think if the statement was reduced to writing, that should be produced *first*." This lent dignity to the written transcription, and perhaps to other alleged dying declarations by further testimony of the brother, and a witness named Erwin who had been sitting with Brown at the hospital for three nights.

The latter testified that Brown was unconscious until 4 o'clock Tuesday morning. At that time Brown "asked me if I thought he would get well." He said he thought he was going to die. He made no further statement at this time. Erwin said that later, on Tuesday night, and when nothing was said by either as to Brown's thought of impending death, over objection witness was permitted to relate what he said Brown had told him. Without commenting on the question as to whether or not Brown had made such statement as to his condition, to sufficiently qualify an admissible dying declaration (which is doubtful), we are of the opinion

that the period of time intervening between this statement and the statement of facts would serve to make the latter inadmissible.

After the transcript had been read to the jury Buford Brown was brought back to the stand, and undertook to cure the obviously defective introduction of the transcription, and in a leading question was asked:

"After Claud told you that he knew he could not get well, and was going to die from this injury, tell the jury in your own way what Claud said to you about what occurred and how it occurred, between him and Bailey."

Witness then said that on Tuesday, after Brown had made the statement to Mr. King, he went to the hospital at 2 o'clock, when he (Brown) had "information Mr. King wasn't there," Brown said to his brother, "I know I can't get well; those licks that they put on my head will kill me, and I will die and die soon. I have not told you who killed me and for what purpose it was done." Thereupon the brother, in testimony covering about three pages, undertook to tell that Claud had told him the whole story, from the proposed ride beginning on Sunday night, to the end, except he said nothing about going to Bailey's home. We shall not detail, but it is in many respects identical as to travels, with Bailey's testimony, but differing in some details. As example, Brown's alleged statement made it appear that Bailey hunted him up on Sunday night, and over his protest took him for the ride. After he got in he tried to get out, but Bailey insisted on the ride. Bailey furnished the first whisky that was consumed. They discussed the matter of the grand jury investigation. Bailey proposed to get money and go to the roadhouse. Brown protested, but went; Bailey bought more whisky, and Brown asked Rhodes for a gun for protection. He tells of the trip to Benton and return to Murray, where they picked up Lenning and the latter took the wheel and drove south, and stopped at the gravel pit, and Bailey insisted on Brown taking a drink. He protested because, "I have to go before the grand jury this morning," however, he took a "good drink." Bailey got out of the car, and insisted on Brown alighting, which he finally did. Bailey began "slapping at him." It seems they took another drink and Bailey "put him in the car and in the middle, the car started, and that is all I re-

member; after we stopped on the side of the highway he hit me, and then I remember being taken down a bank under a bridge. I saw water; they began pulling off my clothes, and put water on my face. Next I remember I was being carried toward Ernest Bailey's. I saw a bridge and they beat me again, Toy Lenning and Ernest Bailey." He said "Ernest hit me with a pistol, and knocked me out."

This statement made by Brown as to his condition laid a sufficient ground to support a dying declaration. The statement is quite fulsome, but we are not called upon to say that it is subject to criticism because containing details of matters not part of the res gestae, under the dying declaration rule. Smith v. Com., 236 Ky. 736, 33 S. W. (2d) 688; Huff v. Com., 250 Ky. 486, 63 S. W. (2d) 606, and cases therein cited. The objection to the testimony of Buford Brown was to the whole, and not to any particular statement of details.

The other meritorious contention is based on the failure of the court to give an instruction on the law of involuntary manslaughter. Bailey denied emphatically that he or Lenning ever struck Brown with a pistol, either at the bridge, at Bailey's home or elsewhere. He did admit, as evidenced supra, that he had struck Brown with his fist at the Bailey home, and he makes it plain that this blow had power behind it. He did this he said when Brown had intruded himself, and to keep Brown from shooting him. He said he had no intention of killing Brown when he delivered the blow.

The court gave the combined murder and voluntary manslaughter instruction, in which he told the jury that if they believed from the evidence beyond a doubt that Bailey, not in self-defense, "struck Brown with a pistol, or other blunt instrument, a deadly weapon," causing his death, they should find him guilty of either murder or manslaughter, depending on whether the striking was with malice, or voluntary manslaughter if in affray, followed by the usual instruction as to the penalty in case of doubt as to the murder charge, and self-defense instruction.

In the recent case of Kearns v. Com., 243 Ky. 745, 49 S. W. (2d) 1009, there was a rough fist fight in which no weapons were used. After the fight one of the participants was found to have been seriously injured, and

later died. On trial for murder the court gave instructions similar to those in the instant case. We held error because of omission of the involuntary manslaughter instruction. In Sanders v. Com., 265 Ky. 671, 97 S. W. (2d) 584, accused and deceased were in a fight. Some witnesses said Sanders struck deceased with metal knucks. Accused said he had no weapon, but admitted he struck with his bare fist.

We held error in failure to give the involuntary manslaughter instruction, citing the Kearns case, supra. More recently we had the case of Cook v. Com., 285 Ky. 749, 149 S. W. (2d) 507, and held error for the same reason. The only difference in facts as between the cases first cited and the Cook case, is that there when the blow was struck with the fist, the deceased fell against the bumper of a nearby automobile, and it was possible that this blow caused the death. In those cases we said that if the evidence of accused was to be believed by the jury he was guilty only of involuntary manslaughter.

In the Kearns' case we pointed to the distinction in the case of Cheatham v. Com., 228 Ky. 765, 15 S. W. (2d) 525, in which physicians testified that from the nature and character of the wounds, they must have been inflicted with a rock, or some sharp instrument in the hands of the accused. There was no indication that deceased in falling struck anything save the ground. It is true that the physicians here ''hardly thought'' that the striking by a fist would produce the wounds they found on Brown. One of them was of the opinion that a fall against a bath tub or lavatory could have produced the results, and clearly of the opinion that if a man was struck with the fist, and then fell to the floor or against a tub or sink, the existing wounds would probably have resulted, and this witness found one which he thought might have been caused by ''one fall, and others that might have been caused by other or several falls; I would have to say these cuts could be produced by these conditions.''

It is noticeable that in the statement to Buford, deceased nowhere said that Claud struck him with a pistol. He attributes this assault to the brother Ernest. So we think in the light of all the testimony appellant was entitled to an instruction as to the law relating to involuntary manslaughter. Also it may be suggested that the instruction on homicide, in either degree, should embrace

624

the law on both theories, that is, striking with a deadly weapon or with the fists, incorporating the idea that if the striking with the fist was with intent to inflict fatal injury under circumstances as might be reasonably calculated to produce fatal injury, then the jury could find him guilty of murder or voluntary manslaughter, according to the finding of presence or absence of malice. Such an instruction will be noted in No. 876, Stanley on Instructions, which as is said was approved in Smith v. Com., 228 Ky. 710, 15 S. W. (2d) 458.

Another question is presented: Appellant insists that he was entitled to an instruction on the right to defend his home from intrusion by an undesirable and claimed dangerous visitor. Reading his testimony very carefully on this point, it is doubtful if he fairly presented such proof as would have warranted this instruction, assuming that the fatal wounds were administered there. He frankly says he knocked Brown down because he was coming at him or "making a play with a pistol." He did not indicate that he was in fear of Brown injuring other occupants. Under the facts, as detailed by him on this trial, we could not consistently hold error in this respect. But because of the errors indicated we are compelled to reverse, reserving all other questions discussed, and remanding the case for a new trial consistent with our opinion.

Judgment reversed.